WEST END ST. RY. CO. v. MALLEY, Collector.

MALLEY, Collector, v. WEST END ST. RY. CO.

(Circuit Court of Appeals, First Circuit. December 10, 1917.)

Nos. 1248, 1249.

1. INTERNAL REVENUE ⬥⬥9—CORPORATION TAXES—"ENGAGED IN BUSINESS."
   A street railway corporation, which leased its lines and property to another corporation in 1897 and had not since operated them, was not in 1913 "engaged in business" within Corporation Tax Law of Aug. 5, 1909, c. 6, § 38, 36 Stat. 112, so as to be subject to the tax imposed by such law.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Engage.]

2. INTERNAL REVENUE ⬥⬥7—"INCOME" TAXES—CORPORATIONS—LIABILITY.
   Where a street railway company demised its lines and property to another company, under an agreement that the lessee should on stipulated dates in each year pay to the persons holding shares of stock, and certified by the lessor as entitled to dividends, stipulated sums per share, the total amount so paid by the lessee was income of the lessor street railway corporation and was subject to tax under Income Tax Act Oct. 3, 1913, c. 16, 38 Stat. 166, 172, for the lease was made by the corporation only, and the stockholders had no interest in the demised property entitling them to rent, but they received their payments merely by virtue of their holding of the stock, and the lessor company could by suit in its own name, without joining the stockholders, recover the agreed payments if withheld.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

3. CORPORATIONS ⬥⬥204—STOCKHOLDERS—RIGHTS OF.
   Where a corporation demised all of its property under an agreement that the lessee should make payments to the stockholders, the stockholders are not the lessors, and can assert no rights as such, but the corporation itself by suit in its own name may in case of nonpayment recover rents due.

4. COSTS ⬥⬥22—RIGHT TO.
   Where plaintiff prevailed on the first count of its declaration though unsuccessful on the second, it was, having recovered more than $500, entitled to costs under Rev. St. § 968 (Comp. St. 1916, § 1609), providing for allowance of costs where a party recovers in excess of such sum.

   Aldrich, District Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; Geo. H. Bingham, Judge.

Action by the West End Street Railway Company against John F. Malley, Collector. There was a judgment in part for plaintiff, and plaintiff brings error, while defendant also brings error. Affirmed.

Thomas Hunt, of Boston, Mass. (Gaston, Snow & Saltonstall, of Boston, Mass., on the brief), for West End St. Ry. Co.

George W. Anderson, U. S. Atty., of Boston, Mass., for John F. Malley, Collector.

Before DODGE, Circuit Judge, and ALDRICH and BROWN, District Judges.

DODGE, Circuit Judge. These two writs of error, brought by the plaintiff and defendant, respectively, in a suit to recover back taxes paid under protest to the internal revenue collector, seek the reversal of a judgment below in the plaintiff's favor for $2,608.17. The District Court, having heard the case by consent without a jury, on agreed facts, found for the plaintiff in the above amount under the first count of its declaration, but found for the defendant collector under the remaining second count thereof.

The plaintiff, a street railway corporation, having leased its lines and property to the Boston Elevated Railway Company in 1897, has not since operated them itself. They have been operated by the lessee, which has regularly made rental payments called for by the lease, for the right to operate said road thereunder. This lease is before us in full, as part of the agreed facts. It was made years before the enactment of either statute hereinafter considered.

[1] 1. The taxes in question under the first count were assessed under section 38 of the Corporation Tax Law of 1909 (36 Stats. 112), for the period January 1—February 28, 1913. The District Court held that the plaintiff was not "a corporation engaged in business" during said period, within the meaning of that statute, and therefore not subject to the tax imposed by it. The question thus presented we regard as controlled against the government's view by the reasoning and result in New York Central, etc., Co. v. Gill, 219 Fed. 184, 134 C. C. A. 558, decided by this court in 1915, the subsequent decisions cited by the District Court in its opinion in the present case, and the following still later decisions: McCoach v. Continental, etc., Co., 233 Fed. 976, 47 C. C. A. 650; Jasper, etc., Co. v. Walker, 238 Fed. 533, 151 C. C. A. 469. We find nothing in the agreed facts now before us which we can regard as sufficiently distinguishing this case from those dealt with in said decisions to warrant us in holding the District Court's conclusion erroneous.

[2, 3] 2. The taxes in question under the second count were assessed under the later Income Tax Statute of 1913 (38 Stats. 166, 172) for the period March 1—December 31, 1913. In accordance with provisions in the lease, the lessee company paid, on stipulated dates in each year, to the persons holding shares of the plaintiff's stock and certified by it as then entitled to dividends, certain stipulated sums per share held. The District Court held that the total amount so paid by the lessee during the above period was income of the plaintiff corporation as lessor, and did not cease to be such because not paid directly to it. The plaintiff contends that said amount was not properly taxable as its income under the statute.

The payments made to stockholders as above were made by the lessee for its use of the corporation's property, not of the stockholders' property. Though they have each an interest in said property, they have no direct interest such as makes them its owners.

The property has been put into the lessee's hands by the lessor corporation, and the payments to be made by the lessee for its use have been agreed on, not between the lessee and the lessor's stockholders, but between it and the lessor corporation to which the property belongs.

That agreement expressly refers to and treats these payments to stockholders as part of the agreed rent for the property. Under it no stockholder could assert rights as lessor, for want of any such interest in the leased property as would have enabled him to lease it or agree upon a rent for it.

No benefit to the lessee, beyond that which would result to it from the lease if all the rental payments called for were thereby made payable directly to the lessor, is secured to it by the provisions of the lease that it shall divide this part of the rent among those who may be the lessor's stockholders from time to time. Those agreements are effective only to spare the lessor the trouble and expense of making the division itself. The lessee's assumption of this trouble and expense is part of the consideration to the lessor agreed upon for the use of its property.

That the lessor railroad could recover the agreed payments to its stockholders by suit in its own name is undisputed. Whether the individual stockholders have rights of action therefor in their own names is at least uncertain. If they have such rights, they are not founded upon any title of the stockholders' own, but upon that of their corporation only. We agree with the opinion of the District Court that the total of these so-called dividends was, within the meaning of the statute, "income arising or accruing" to the corporation. The District Court's conclusion is supported by a Court of Appeals decision. Anderson v. Morris, etc., Co., 216 Fed. 83, 90, 132 C. C. A. 327. Though it was the Corporation Tax Act of 1909 which was there under consideration, a question passed upon was whether or not such dividends paid to stockholders by the lessee were part of the lessor's "entire net income * * * received by it from all sources" during the year; and the court in effect held that it was. The inquiry in this case is whether such dividends are part of the lessor's "entire net income * * * arising or accruing from all sources" to it during the year. So far as the difference in phraseology is of any significance, it favors a more, rather than a less, inclusive construction. This decision having been followed by Judge Ray in the same circuit, since the decision here appealed from, Rensselaer, etc., Co. v. Irwin (D. C.) 239 Fed. 739, in a case arising, like this, under the Income Tax Statute of 1913, we are unable to find sufficient reason for a refusal to follow it in this circuit.

[4] 3. The District Court ordered that costs should not be allowed to either party, and this ruling is assigned as error by the plaintiff West End Company. Having prevailed on its first count, though unsuccessful on its second count, we think it was entitled to its costs, according to the usual rule in cases where the prevailing party recovers less than he claims, in a suit at law, but not less than the $500 necessary to carry costs under Rev. Stats. § 968 (Comp. St. 1916, § 1609). No question as to items of the taxation is before us.

The judgment of the District Court is affirmed, except so far as it denies costs to the plaintiff, to which extent it is reversed, and the case is remanded to that court for further proceedings in accordance with this opinion. Each defendant in error recovers its costs in this court.

ALDRICH, District Judge (dissenting). There are several questions, but I disagree with the majority opinion only upon the single

question raised by the West End Railroad which relates to a tax assessed upon supposed income under the Income Tax Statute of October 3, 1913 (38 Stat. 172).

Under the power conferred upon Congress by the Sixteenth Amendment of the Constitution of the United States to lay and collect taxes on incomes, from whatever source, the corporation income tax of 1913 was enacted without the limitation phrase of the statute of 1909, "organized for profit," and, so far as domestic corporations are concerned, omitting the other phrase of limitation, "engaged in business."

It is, of course, manifest that Congress, by virtue of the power conferred by the constitutional amendment, intended to create the right to lay an income tax, not only upon individuals, but to broaden the provisions of the statute of 1909, at least in respect to domestic corporations, no matter how created or organized. This case, however, does not require a discussion of the general question as to what kind of corporations are touched by the act of 1913 which were not within the operation of the act of 1909, because it is clear, regardless of the question whether it is engaged in business, that the West End is a corporation subject to the income tax, provided it is receiving an income within the meaning of the statute of 1913. Thus it would follow that the tax was properly levied and is enforceable, provided the income in question arose and accrued to the corporation; in other words, provided it was the income of the West End Railroad.

The West End strongly contends that the income in question was not its income, but was the income of its shareholders, arising or accruing to them under the business operations of the Elevated Railroad and by virtue of the provisions of the lease or contract between the West End and the Elevated.

No one now questions the general and familiar rule that, when controversies arise as to whether particular statutes were directed against property upon which the tax is levied, the provisions will not be extended beyond the clear import of the language used, and, as taxes are a burden imposed by a government, that it must be clear that they apply to the situation in question. Gould v. Gould (November 19, 1917) 38 Sup. Ct. 53.

There are a number of cases which discuss the question whether the remaining activities of corporations which had leased or transferred their business to others were sufficient to bring them within the meaning of the statutory provision in respect to corporations carrying on business. But, after all, as said by the Supreme Court in Von Baumbach, Collector, v. Sargent Land Co., 242 U. S. 503, 516, 37 Sup. Ct. 201, 61 L. Ed. 460, the decision in each case must depend upon the particular facts before the court, and the same idea would hold in a case of this kind, because the real question is whether, under the particular circumstances of this case, the income was the income of the West End Railroad, received in its capacity as a corporate entity or in its corporate right, and so clearly so as to make the corporation subject to the income tax provision in respect to corporations. Can it be said that Congress clearly intended to subject a corporation, situated as the West End is, to the income tax created by the act of 1913? I think

not. The income, under the circumstances, was not the income of the corporation, but of those who, under the lease, succeeded to the right of the corporation to receive an upset or stipulated sum for the use of its property.

The lease in question is dated December 9, 1897, and is for the period of 24 years, 8 months, and 9 days, and by its terms the West End granted and transferred its railway, and property of every description, reserving to itself only an obligation created in its favor under the lease whereby the Elevated was to pay yearly $7,500 (later $8,600) in order that the West End might maintain an office and an organized existence for certain limited purposes. The West End, in every practical sense, turned over to the Elevated its railway system and its right to operate and do the business contemplated by its charter, and thus became a mere shell, taking no part in the actual operations of the system, and expressly limiting its income to the $7,500, or the $8,600, provided under the lease for special purposes. Under the lease arrangement the shareholders were provided for and protected by a provision whereby each holder of common stock was to receive for each share direct from the Boston Elevated $1.75 each year during the continuance of the lease, and each holder of preferred stock $2 per share each year. Neither the income of the individual shareholder of the West End nor the obligation of the Elevated to pay depended at all upon earnings; and, so far as doing business for profit was concerned, the activities of the West End had ceased as the result of the lease transferring the right to operate. Here is a perfectly legitimate income status created before the law, in which it is not only contemplated, but expressly provided, that certain and stated sums which are not to be affected by earnings, or by statutory methods and deductions prescribed for the ascertainment of taxable corporate income, shall be paid directly to the shareholders.

In view of such complete transfer of the corporate right to do business and to receive income based upon operations and earnings, and in view of its complete surrender and transfer to the shareholders of its right to receive income as a corporate entity, either from its operations or under the lease, it seems extremely fictional to say that the money paid to the shareholders under the terms of the contract was the income of the West End Railroad within the meaning of the statutory provision in question. It is a significant fact that the sum paid to the shareholders is not a sum necessarily based upon the income from the operations of the West End system by the Boston Elevated, nor is it to be ascertained by the contemplated and prescribed statutory method of deducting from the gross amount of income the ordinary and necessary expenses of maintenance and operation of its business, but it comes as an arbitrary sum established by contract, and the shareholders are apparently entitled to have it without regard to whether the operations of the West End by the Boston Elevated under the lease results in net profit or income; and, indeed, without regard to the question whether the operations result in loss. The fact that the statute carefully prescribed the manner in which corporate income, against which the law was intended to be directed, should be ascertain-

ed, has a very important bearing upon the question whether it was intended that the act, in respect to corporate tax liability, should operate upon definitely established income to shareholders who succeed to the income rights of the corporation, and whose rights under such succession are to receive a definitely established sum under the contract.

There has been some discussion of the question whether these sums received by the shareholders are income in the nature of profits resulting from operations, or whether they are rents. The lease treats the payments to the shareholders as payments of rent, but, in the statutory sense, whether it is rent based upon profits or not is of little consequence. Under the stipulation the income arises or accrues directly to the shareholders, and this is so regardless of whether it is strictly rent, or income based upon profits, and quite independent of the question whether the operations under the lease result in profit or loss.

Though shareholders receive corporate fruits through dividends, they are in every substantial sense real owners of corporate rights and properties, and under proper limitations and adjustments are entitled to the fruits of the corporate business. Whenever a corporation in its artificial corporate capacity under statutory creation receives profits from the earnings of a system, it receives something which it holds in trust for the benefit of the shareholders; and it is difficult to see any reason why it may not transfer the right to receive income or profit to the real owners. And it is difficult to discover that the lease in question created agency relationship between the West End and the Elevated in respect to the payments to the shareholders, as that was something done by the Boston Elevated to discharge an obligation created in their favor by the lease and was payment of money which the shareholders were entitled to receive under their own enforceable right from the Boston Elevated.

The shareholders do not, in any sense that I can see, receive the stipulated sums from the Elevated as an agent of the West End; but rather in their own right as owners of stock. True enough, when the entity is in control of the property by consent of the shareholders, managing for business purposes, and for purposes of income and dividends, the corporation may be taxed for the income; but when, within the scope of its corporate agency, it turns over its management to another, and creates rights in the shareholders to receive stipulated sums because they own certain shares of stock which represent the property, it creates for them, as owners, property rights as principals, quite independent of any agency relationship between the lessor and lessee.

The rights of the shareholders must be enforceable by them under the obligation created in their favor (Penn. Steel Co. v. New York City R. Co., 198 Fed. 721, 747–751, 762–765, and cases cited, page 762, note 22, 117 C. C. A. 503, p. 544, note 22; Forbes v. Thorpe, 209 Mass. 570, 581, 95 N. E. 955), because in every substantial sense they are the beneficiaries entitled to receive the fruits of the corporate property.

The whole scheme of the lease transaction was, first, to put the management of the corporate property, together with its income resulting from operation, out of the hands of the West End and into the hands of the Elevated, and, second, under the transfer, to create a definite income in favor of the shareholders, which was to be not only definite in amount, but definite in the right of the shareholder to receive it directly; and thus the income received by the shareholders from the Elevated was their own income and not the income of the West End, which had transferred its right to receive it from the operations of road to the Elevated, and had created a distinct right in the shareholders to receive it by virtue of the lease.

In this case, as in the case of Rensselaer & S. R. Co. v. Irwin (D. C.) 239 Fed. 739, the lease was executed long before the enactments of the statutes in respect to corporate income, and therefore it can be said here, as there, that no fraud on the law was intended.

The Rensselaer Case was decided upon the theory that the payments provided for by the lease were based upon profits and were payments as rents, and, though paid direct to the stockholders, that they were in legal effect received by the plaintiff corporation, and were the corporation's net income within the meaning of the statute. This reasoning was apparently based upon the idea that, if any other view was held, corporations would escape payment of an income tax by leasing their properties and providing for the payment of their surplus earnings direct to the stockholders, and that few corporations would pay an income tax.

It is not apparent that the danger pointed out justifies the extreme fiction involved in holding that actual payments to stockholders in a contract situation like the one here, and one involving good faith, were in legal effect, contrary to the fact, payments to the corporation. It is not necessary to say whether such danger, if a real one, would justify the fiction, because it may be said that the apprehended danger is not real, and this is so because, when a corporation sees fit to go out of the practical management of its system and transfer its earning capacities to another corporation, which operates for profit and income, that corporation would doubtless become a corporation subject to the income tax, because it would be bound to pay the statutory tax on net income arising or accruing from all sources, and this is so because, whenever profit results from the rightful operation of the leased system, it would be a source of income contemplated by the statute creating the tax.

And, again, as the West End Railroad, as an artificial entity, had ceased its business activities and turned over to the shareholders the right to receive an income based upon a contract right, not to be affected by the contemplated statutory calculations and deductions, it is not plain to see why the shareholders would not be subject to tax after the income had actually reached them.

It is, of course, not a question here whether the Elevated is liable to be taxed, or whether the individual shareholders of the West End are so liable because they are not parties. The precise question is whether the payments to the shareholders of the stipulated definite sums

named in the lease were an income of the West End as a corporation within the meaning of the statute, and the supposed question in respect to the liability of the Elevated and that of the individual shareholders to be subjected to a tax, are only referred to as illustrations which tend to solve the question of the liability of the West End.

In a situation like this, speaking generally, the income from the operations of the West End first inures to the lessee operating under the lease, and then, under the terms of the lease, to the shareholders in the lessor corporation. It is difficult to see why the earnings of the West End, less the operating expenses, the amount paid to the shareholders, under the contract, and other proper deductions, if any, are not income of the Elevated under the lease as income within the statutory meaning of "income from all sources," and it is difficult to see why the dividends deducted by the Elevated from the earnings of the West End, when paid to the shareholders, should not become the income of the individual shareholders and taxable to them as such. This would not be double taxation, because the amounts of the dividends were deducted from the gross earnings under the lease, but, if taxed to both the shareholders and the West End as income, it would be double taxation in respect to the same business, something which, as said in McCoach v. Minehill, 228 U. S. 295, 304, 33 Sup. Ct. 419, 57 L. Ed. 842, could not have been contemplated.

Anderson v. Morris E. R. Co., 216 Fed. 83, 132 C. C. A. 327, furnishes very little, if any, support to the claim that the contemplated and stipulated payments to the shareholders under the circumstances of this case were the income of the West End. That was a case where the reasoning had reference to the question whether the corporation was engaged in business within the meaning of the law of 1909, and it was there said that the fact that the payments were by the lessee to the stockholders would not prevent the act—meaning, of course, the act of 1909—from applying to the money so paid, if the other conditions of the act make its terms applicable, meaning, as it would seem, that it would be considered, among other things, upon the question whether the corporation was doing business. The court in that case could not and did not determine that income paid to stockholders, under circumstances like those existing in the case now under consideration, was income of the leasing corporation. And that is so because that court had neither such a question nor the statute of 1913 before it.

In McCoach v. Minehill R. Co., 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842, the corporation was leased, and the lessor maintained its corporate existence to collect and distribute to its stockholders the rental from the lessee, and also dividends from investments; yet it was held that it was not doing business within the meaning of the Corporation Tax Act of 1909.

The case of Lewellyn v. Pittsburg, B. & L. E. R. Co., 222 Fed. 177, 184 (137 C. C. A. 617), in its reasoning as to the question whether the leasing corporation was doing business, among other things, says:

"The plaintiff railroad corporations received no income from railroads operated by themselves, and expended none in the operation of railroads or for any other purpose. Receiving no income and disbursing none, there was, of course,

no gross income from which to determine net income, and no means to measure an excise tax as provided by the statute. Therefore, in being without income from operating their railroads, the lessor railroad corporations to this extent at least were outside of the scope of the statute."

While the reasoning of these cases has no direct bearing upon the question here, yet, by holding that the corporations under the dividend status with which they were respectively dealing were not doing business within the meaning of the statute to which the cases relate, it does through analogy sustain the idea that the West End was out of business, and that it had transferred the income under the lease to the shareholders.

The West End was not operating. It was, in fact, receiving no income either from its own operations or from the operations of others. It had bodily transferred its property, and its management, and the right to receive income, and it is difficult to find how it can reasonably be said that they have a gross income from which the statutory deduction can be made in order to get at the measure of net income contemplated by the statute of 1913.