## Appeal of AMERICAN TELEGRAPH & CABLE CO.

Docket No. 2967. Submitted July 1, 1925. Decided October 26, 1925.

Taxpayer leased all its property for $700,000 rental, the lessee to pay the rental direct as dividends to stockholders of lessor. The lessee owned stock of the lessor and, without being obligated to do so, paid income and profits taxes for the year 1919 in the year 1920 for the account of the lessor. Taxpayer excluded from its income that portion of rental representing dividends to the lessee. Commissioner held entire amount of rental and the tax assumed and paid and the prospective tax in issue were all income of 1919. In 1923 taxpayer and lessee entered into a contract whereby all future tax payments were made obligations of the taxpayer paid by lessee and to be reimbursed by notes as payments were made from time to time. *Held*, that the income and profits

taxes paid or to be paid on account of taxpayer were not income to it for the year 1919 and that the taxpayer was in receipt of income representing the entire amount of rent stipulated in the lease.

*Sanford Robinson* and *J. Julien Southerland, Esqs.*, for the taxpayer.

*George G. Witter* and *James T. Dortch, Esqs.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits taxes for the year 1919 in the amount of $19,020.06

### FINDINGS OF FACT.

The American Telegraph & Cable Co. is a corporation organized under the laws of the State of New York and, during the taxable year in question, was not engaged in active business, its property and franchise having been leased to the Western Union Telegraph Co., also a corporation organized under the laws of the State of New York.

On May 12, 1882, the taxpayer entered into an agreement with the Western Union Telegraph Co. for the lease, for a period of 50 years, of two certain transatlantic cables between Sennen Cove, England, and Dover Bay, Nova Scotia, and also for the lease of a certain cable thereafter to be constructed between Brazil and the United States. In consideration for such lease the telegraph company agreed, in clauses fourth, fifth, and ninth of the lease agreement, as follows:

Fourth. The Telegraph Company hereby agrees to maintain, operate and renew the said two transatlantic cables, and land lines as may become necessary, at its own cost and expense, during the continuance of this agreement, and at the expiration of this agreement will deliver up to the Cable Company two transatlantic cables and the necessary appurtenances for efficiently operating the same in good working order and condition.

Fifth. The Telegraph Company hereby agrees to pay for the rental of the two transatlantic cables, the land lines, equipments and other property and assets of the Cable Company as aforesaid, the yearly sum of seven hundred thousand dollars, ($700,000), in each year, in quarterly instalments of one hundred and seventy-five thousand dollars ($175,000) at the end of each quarter, to wit: On the first days of September, December, March and June, respectively, the said payments commencing on the first day of September, 1882, and that such payments shall be made directly to the Stockholders of the Cable Company, to secure which payments the Telegraph Company further agrees that its secretary shall sign a guarantee and affix the seal of the company thereto for the payment of dividends at the rate of five per cent per annum, payable quarterly as above mentioned, on the certificates of the capital stock

of the Cable Company, to be issued to the American Cable Construction Company, not to exceed the aggregate of fourteen millions of dollars, in payment for the two cables, in accordance with an agreement of even date herewith between those companies.

Ninth. The Cable Company hereby agrees to keep up its organization as a corporation, and the Telegraph Company, on its part, agrees to pay to the Cable Company the further sum of not to exceed twenty-five hundred ($2,500) per year during the continuance of this agreement, the same to be used by the officers of the Cable Company as and for an administration fund, for the purposes of defraying the necessary expenses of maintaining the organization of the Cable Company as a corporation and the payment of the same is to be made in such manner and at such times as the officers of the Cable Company may direct.

By supplemental agreement, dated November 15, 1883, that portion of the agreement of May 12, 1882, relating to the Brazilian cable was canceled.

Thereafter, and in conformity with the requirements of the above-quoted paragraphs, the telegraph company operated and maintained the transatlantic cables in question, paid the operating expenses of the taxpayer corporation, and paid directly to the stockholders of the cable company dividends at the rate of 5 per cent per annum upon the stock of the said cable company in an amount not exceeding $700,000.

During the taxable year in question the telegraph company was the owner of 22,529 shares of the 140,000 shares issued and outstanding of the capital stock of the cable company. During that year the telegraph company paid a total amount of $587,355 dividends direct to the stockholders of the cable company. It did not pay or enter on its books any amount representing dividends upon the stock owned by itself, which dividends, had they been paid or set up on the books, would have amounted to $112,645. The telegraph company also paid the expenses of carrying on the corporate organization of the taxpayer for the year in question, in the amount of $2,112.74.

At all times prior to and including the taxable year 1919, the telegraph company made Federal income-tax returns for the cable company and paid the amount of the tax shown to be due thereon. For the taxable year 1919, income was returned in the amount of $587,355 plus $2,112.74, and the said $2,112.74 was deducted as operating expenses, leaving the taxable income at the amount of the dividends paid to stockholders other than the telegraph company. Upon the return so made the telegraph company paid the tax, amounting to $58,535.50, in 1920.

Thereafter, the Commissioner audited the return of the taxpayer and added to income the amount of $112,645 alleged to represent a constructive receipt of rent by the taxpayer and a constructive

92208—26——63

payment of dividends to the telegraph company, and also added to income the amount of $58,535.50, paid as income and profits tax as above set forth, and added to income the further amount of $19,020.06, the amount of deficiency here in question and alleged to represent a further item of income of the taxpayer on account of the prospective payment of the deficiency here in question.

· On October 25, 1923, at a special meeting of the board of directors of the cable company, the telegraph company advised the cable company that it had, since the enactment of the first Federal income tax law, advanced from time to time, as required, amounts necessary to pay the corporation income tax due from the cable company to the United States, without any formal arrangement for reimbursement; that they were advised by counsel that there was no obligation on the part of the telegraph company, by lease or otherwise, to pay this tax; that they would not continue to pay the tax or make advances for that purpose without a formal agreement by which the company would be assured of reimbursement. The telegraph company indicated its willingness to continue to pay the taxes if assured of reimbursement, and attached to the communication an outline of a proposed agreement for that purpose. The pertinent provisions of such proposed agreement, which was at the meeting above set forth duly accepted by the directors, are set forth below:

(a) Commencing with the fourth installment of the Federal income tax for the year 1922 (payable December 15, 1923), and continuing during the remainder of the term of the agreement of May 12, 1882, between The Western Union Telegraph Company and American Telegraph & Cable Company, that is until May 12, 1932, or, in the event of an earlier determination of said agreement, until such earlier determination, The Western Union Telegraph Company to lend to American Telegraph & Cable Company the funds required to meet the Federal income taxes imposed upon the taxable income of American Telegraph & Cable Company in such amounts and at such times as may be required.

(b) The money to be advanced by the Western Union Telegraph Company under this arrangement to bear interest from the dates the respective loans are effected, at the rate of 6 per cent per annum, compounded semi-annually.

(c) The principal thus to be advanced, and the accumulated interest thereon, to be due and payable upon demand of the Western Union Telegraph Company, and to be evidenced by properly executed notes of American Telegraph & Cable Company in favor of the Western Union Telegraph Company. American Telegraph & Cable Company to agree to renew such notes, with accrued interest, as and when requested by the Western Union Telegraph Company.

*    *    *    *    *    *    *

(f) The Western Union Telegraph Company to waive any claims for reimbursement from American Telegraph & Cable Company in respect to the sums already paid in Federal income taxes by the Western Union Telegraph Company on the taxable income of American Telegraph & Cable Company

since the Federal Income Tax Law became effective in 1913, without prejudice, however, to the validity of its claim for reimbursement in the event of the rejection of this proposition.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 10 days' notice, under Rule 50.

### OPINION.

JAMES: The deficiency here asserted by the Commissioner is comprised in three items of alleged additional income. The first is the item of $112,645, being the difference between the dividends paid to the stockholders of the taxpayer other than the Western Union Telegraph Co., and the $700,000 rental specified in the lease: The second is the item of $58,535.50 paid by the Western Union Telegraph Co. as income and profits tax of the taxpayer for the year 1919, which payment was made in the year 1920. The third is the item of deficiency in tax which the Commissioner has determined at $19,020.06 and includes in the alleged taxable income for 1919. Just how the Commissioner ascertained this tax by computing the tax upon the tax in this manner is not disclosed by the record, as his computations are not in evidence.

As a defense to the asserted deficiency, the taxpayer asserts, first, that none of the payments stipulated in the lease between the Western Union Telegraph Co. and the taxpayer constitute income to it, but that all are direct dividends assumed by the telegraph company and are neither constructively nor actually income of the taxpayer. In the second place, the taxpayer contends that even if the amount of $587,355 was income to the taxpayer, the additional amount of $112,645, being payable by the Western Union Telegraph Co. under its contract to itself, could not constitute income to the taxpayer, either actually or constructively. In the third place, the taxpayer contends that the tax items in question could not be income to the taxpayer, since the payments were not made by virtue of any contract, agreement, or other obligation, and were either a voluntary gift by the telegraph company or advances by that company, which were forgiven in 1923, and in either event could not be income in 1919.

As respects the item of $19,020.06—the deficiency here in question—we are clearly of the opinion that this amount could not be income to the taxpayer in any year. It appears from the agreement of October 25, 1923, between the companies, that all payments of income and profits taxes subsequent to that date were assumed un

equivocally by the taxpayer to be paid out of loans from the telegraph company. If any portion of the $19,020.06 shall therefore be found to be due, the burden of its payment will not be borne by the telegraph company, but by the taxpayer, and the full amount will constitute a debt from the taxpayer to the telegraph company until paid.

The item of $58,535.50 presents a more difficult question. This payment was made in ordinary course in the year 1920, apparently upon the assumption by the telegraph company at that time that it was obligated to make the payment, although both parties later concluded that no such obligation existed. The telegraph company at that time was in full possession of all the facts, and whether the payment of the amount under these circumstances was recoverable from the taxpayer is at least doubtful. If it was recoverable, the payment would not constitute income to the taxpayer, since immediately upon the payment being made, the amount became a claim against it by the telegraph company. If, on the other hand, the amount could not be recovered, there may well be a question whether such a payment was a gift in any real sense so as to exclude the amount from taxable income. *Appeal of Herschel V. Jones,* 1 B. T. A. 1226. It is not necessary, however, to consider this question. The tax upon the 1919 income of this taxpayer was not due until 1920, and, of course, it was not in fact paid until 1920. *Appeal of L. S. Ayers & Co.,* 1 B. T. A. 1135. The accrual of this tax liability in 1920 and its payment in that year could not serve to increase the income of the taxpayer in 1919, whatever the effect on the income for the year 1920, as to which we express no opinion. *Appeal of Norwich & Worcester R. R. Co.,* 2 B. T. A. 215. The record before us clearly indicates that some payment was doubtless made in the year 1919, by the Western Union Telegraph Co., on behalf of this taxpayer, on the income for the year 1918. No proof, however, was introduced by the Commissioner or the taxpayer upon this point, and the pleadings of the Commissioner are silent as to any such possible offsetting item. Such being the case, the Board has no option but to disallow that portion of the deficiency which is predicated upon the payment of $58,535.50.

We come next to the consideration of that portion of the deficiency based on the addition to income by the Commissioner of $112,645, alleged to have been constructively received by the taxpayer in connection with the payment of the stipulated rental and dividends under the lease of 1882. Inasmuch as under the first defense of the taxpayer this amount is merged with the larger sum of $587,355, the point there raised will be first considered.

On this point—namely, that payments used to meet dividends, interest and sinking-fund charges by lessees to or for lessors are not

income of the lessors—there are a number of well considered decisions by Circuit Courts of Appeals.

The latest and in many respects the most significant of the decisions of the courts upon this general point is *Hamilton* v. *Kentucky & Indiana Terminal R. R. Co.*, 289 Fed. 20, decided by the Circuit Court of Appeals, Sixth Circuit, on May 8, 1923. In that case the terminal company was organized with a capital stock of $75,000, held in equal proportions by three railroad companies using the terminal. The terminal company, in addition, had outstanding $6,000,000 of bonds, guaranteed both as to principal and interest by the railroad companies. The railroad companies were charged so much per car for the services of the terminal company, which charge was rendered on monthly bills and included all of the cost of operation of the terminal company and the amounts estimated to be necessary for fixed charges, including interest and sinking-fund charges on bonds. It was further agreed among the railroad companies that no dividends would be declared from the operations of the terminal company, but that all surplus and net earnings should be used for additions and improvements to the property of the terminal company. Upon the argument that the terminal company was a mere conduit serving the purposes of the railroad companies, the court said:

We are not impressed with the Terminal Company's contentions that it acted only as distributing agent in the collection of the interest payments from the proprietary companies. The Terminal Company owned the terminal properties subject to the payment of the mortgages thereon. The interest money was thus paid to and used by the Terminal Company for meeting charges against its own property, default in whose payment might well result in the loss of the property. Had the interest payments been made by the proprietary companies directly to the bondholders or the mortgage trustee, the payments would have been none the less income of the Terminal Company.

To the same effect is *Houston Belt & Terminal Ry. Co.* v. *United States*, 250 Fed. 1. The facts in this case were substantially the same as those in the *Kentucky & Indiana Terminal R. R. Co.* case, *supra*, except that interest and sinking-fund payments were made by the railroad companies to the trustee without physically passing through the hands of the terminal company or appearing on its books. This case arose under the Act of 1909, whereas the *Kentucky & Indiana Terminal R. R. Co.* case arose under the Acts of 1913 and 1916. No difference in principle is laid down between the cases.

The third case is *Boston Terminal Co.* v. *Gill*, 246 Fed. 664, also arising under the Act of 1909, identical with the holding in that of the *Houston Belt* case.

But the taxpayer in this appeal contends that there is a difference between a case in which payments are physically made and

one in which the operations are not physically carried through the books and the cash does not physically pass between the lessor and lessee, but is short circuited, so to speak, to ultimate beneficiaries, in the instant case to stockholders of the taxpayer in this appeal. We are unable to find any authority for this proposition; but, on the contrary, find consistent authority holding otherwise as to cases arising under both the Excise Tax Act of 1909 and the Income Tax Acts of 1913 and succeeding years.

The first case on this point is *Anderson* v. *Morris & Essex R. R. Co.*, 216 Fed. 83. In that case, which arose under the Act of 1909, the Delaware, Lackawanna & Western Railroad Co. was lessee under a lease, the terms of which are strikingly like the lease in the instant appeal. Under that lease the lessee was required to make payments of interest on bonds and dividends on stock in a stipulated amount as rental for the use of the property of the Morris & Essex Railroad Co., these payments being, in all cases, made direct. The case was decided upon the point that the Morris & Essex Railroad Co. was not engaged in business, but the court felt itself required to decide whether the railroad company had an income in excess of $5,000 before it decided the point whether that income arose from the doing of business. Upon the question of income the court held that the entire amount paid was income to the Morris & Essex Railroad Co.

Next in order of time is *Rensselaer & Saratoga R. R. Co.* v. *Irwin*, 239 Fed. 739, affirmed by the Circuit Court of Appeals, Second Circuit, 249 Fed. 726. That case arose under the Act of 1913, and was decided March 5, 1917. Here, also, the lessee paid interest on bonded indebtedness and dividends upon capital stock directly to the bondholders and stockholders, and the claim was made, as in this appeal, that this did not constitute income to the lessor corporation. Two paragraphs of the opinion by Ray, District Judge, are particularly significant in the instant appeal:

It seems to me that this whole question centers about the proposition: Does this lease operate to divest the plaintiff corporation of ownership of the *rents* to be paid before they accrue and become payable, and of which rents the sums to be paid the stockholders form a part? The legal ownership of rents for corporate property is in the corporation, notwithstanding its agreement that the lessee shall pay same directly to the stockholders. It seems to me clear that all sums of money and considerations agreed to be paid for the use, possession, and occupation of the corporate property belongs to the corporation, the legal owner of such corporate property. It is by way of dividends that the stockholders are entitled to the earnings of the road or any part thereof. That the sums agreed to be paid by the lessee for the use of the lessor's property are earnings cannot be questioned. Such sums are the consideration paid for the use of the property.

There are many cases holding that where dividends are actually declared to stockholders, and the stockholders are indebted to the corporation, the corporation may withhold the dividend or enough thereof to satisfy its claim.

If this railroad corporation owes this income tax to the government and it is compelled to pay it, and this lease, as it does by its terms, provides that the only revenues or income of the corporation is to be paid to the stockholders direct, it seems to me that by notice to the lessee and by an equity action, if necessary, provision may be made for the retention by the lessee and payment to the lessor of a sufficient amount to satisfy the tax. This may not be the remedy, but there must be a way to protect the corporation. I do not think the fact that this lessor corporation has no available funds or money in its possession with which to pay the tax has anything whatever to do with the question whether or not it has a taxable income under the federal law referred to.

On appeal to the Circuit Court of Appeals, Second Circuit, Ward, circuit judge, said:

It is true that the rent of its road does not go into the plaintiff's treasury and that it has no means of withholding the tax from it. It is also true that the rent reserved by the lease is paid by the lessee in fixed sums to third parties. All the same, the rent is the property of the plaintiff, and remains such, though by the terms of the lease paid out to others, whose rights are derived through it. While the rent is a debt of the lessee to the lessor, it is, as between the lessor and its stockholders, the lessor's income, out of which the dividends, if any, are to be paid. The application of the rent under the lease is a mere labor-saving device, the effect being exactly the same as if it be paid to the lessor and by it paid out as far as necessary to bondholders for interest, and the surplus in dividends to its stockholders. The description of the fixed sum to be paid by the lessee of 8 per cent to the lessor's stockholders as a dividend shows that the payment is made as agent of the lessor.

To the same effect is *Blalock* v. *Georgia Ry. & Electric Co.*, 246 Fed. 387. Walker, circuit judge, deciding the case in the Circuit Court of Appeals, Fifth Circuit, said:

The difference between the way the rent under the lease here in question was paid and the way the same aggregate amounts would have been paid, if the lease had made the installments payable to the corporation itself, is one of method and not of substance. Where the circumstances of a corporation are such that it can and does adopt the policy of distributing among its stockholders as promptly as practicable net income accruing from the corporate business or property, an arrangement whereby its debtor, who contributes the whole or a part of this income, makes the desired distribution· of it among the corporation's stockholders amounts to no more than the corporation procuring its debtor to render a service for it; the net result being that the debtor, instead of remitting or paying what it owes direct to the creditor, makes the payment to others as directed by the creditor. A creditor, as truly receives payment of what is due him when, pursuant to his direction, the debtor makes payment to another, as he does when payment is made directly to himself.

To the same effect is *West End Street Ry. Co.* v. *Malley*, 246 Fed. 625, decided by the Circuit Court of Appeals, First Circuit, December 10, 1917. This case arose partially under the 1909 Act and partially under the 1913 Act. There, also, dividends were paid upon the stock direct to the stockholders. In deciding for the Government, Dodge, circuit judge, said:

The payments made to stockholders as above were made by the lessee for its use of the corporation's property, not of the stockholder's property. Though they have each an interest in said property, they have no direct interest such as makes them its owners. The property has been put into the lessee's hands by the lessor corporation, and the payments to be made by the lessee for its use have been agreed on, not between the lessee and the lessor's stockholders, but between it and the lessor corporation to which the property belongs. That agreement expressly refers to and treats these payments to stockholders as part of the agreed rent for the property. Under it no stockholder could assert rights as lessor, for want of any such interest in the leased property as would have enabled him to lease it or agree upon a rent for it.

No benefit to the lessee, beyond that which would result to it from the lease if all the rental payments called for were thereby made payable directly to the lessor, is secured to it by the provisions of the lease that it shall divide this part of the rent among those who may be the lessor's stockholders from time to time. Those agreements are effective only to spare the lessor the trouble and expense of making the division itself. The lessee's assumption of this trouble and expense is part of the consideration to the lessor agreed upon for the use of its property.

That the lessor railroad could recover the agreed payments to its stockholders by suit in its own name is undisputed. Whether the individual stockholders have rights of action therefor in their own names is at least uncertain. If they have such rights, they are not founded upon any title of the stockholder's own, but upon that of their corporation only. We agree with the opinion of the District Court that the total of these so-called dividends was, within the meaning of the statute, "income arising or accruing" to the corporation.

But the taxpayer in this appeal contends that, even though the amount of $587,355 paid as dividends to stockholders other than the Western Union Telegraph Co. may have been income to the taxpayer, nevertheless the $112,645, neither paid nor credited in any form because the lessee and the stockholder are identical, can not constitute income to the taxpayer. The quoted portions of the above opinion indicate clearly the reason this argument can not prevail. There are two steps in the proceeding. The Western Union Telegraph Co. under its lease pays and is obligated to pay rent to its lessor in the amount of $700,000 per annum. It is also obligated, on behalf of its lessor, to deliver the amount of rent so contracted to be paid to the stockholders of the lessor, acting as the lessor's agent in this regard. Because the Western Union Telegraph Co. was a stockholder, and because, therefore, no one could complain if it failed to draw a check in favor of itself in connection with the settlement of rent, it is argued that that rent could not be income to the taxpayer, but it appears at least in the *Houston Belt & Terminal Ry. Co.* case, *supra*, and the *Kentucky & Indiana Terminal R. R. Co.* case, *supra*, that the stock of the taxpayers in those cases was owned by the tenant or lessee companies; but this fact does not appear to have influenced the decision of the court. Unless the lan-

guage which we have quoted from the decided cases is to be restricted, and particularly unless we are to regard the position of the telegraph company, as lessee, as merged with its position of stockholder of the lessor, we can not ignore the dual positions which it occupies, nor can we ignore the separate and distinct individualities of the taxpayer and telegraph company. The telegraph company owes and pays rent to the taxpayer. The telegraph company is the agent of the taxpayer, distributing that rent among its stockholders. These are two separate and distinct acts; and the mere fact that it does not choose to draw a check in favor of itself when it is acting as the agent of the taxpayer for the distribution of dividends does not deprive the lessor in the earlier transaction of the payment of rent to the amount of $112,645.

Perhaps this can be further clarified by reversing the relationship of the parties. If we assume that the telegraph company is appealing here from an assertion by the Commissioner that it might not deduct rent in the full amount of $700,000, but only rent in the amount of $587,355, the sum actually paid out, and if, also, the telegraph company were claiming, in addition to the deduction of $700,000, that the offsetting item of $112,645 was a dividend to it, and therefore exempt from taxation in 1919, could the Commissioner or this Board deny the correctness of either of those positions if taken and urged by the telegraph company? We believe the answer is obvious. There is a payment of rent and there is a distribution of dividends, and the failure to enter these transactions upon the books of account or to carry them through in any physical manner can not deprive them of their essentially separate and distinct characters. The adjustments made by the Commissioner must, therefore, be approved by adding to the income of the taxpayer the difference between the rent returned by it and $700,000. The additions of $58,535.50 and $19,020.06 made by the Commissioner are disallowed and the deficiency should be recomputed accordingly.