BOWERS, Collector of Internal Revenue, v. NEW YORK TRUST CO. et al.

(Circuit Court of Appeals, Second Circuit. November 16, 1925.)

No. 63.

1. Equity ⬨46—Legal remedy must be, not only adequate, but clear, in order to bar equitable relief.

Legal remedy must be, not only adequate, but clear, in order to bar equitable relief.

2. Internal revenue ⬨7—Commissions paid to individual partner for services by partnership held not "income" of partnership.

Where partners of selling agency for group of mills agreed that, in consideration of one of partners giving up his right under original partnership contract to 60 per cent. of gross receipts, partnership would act as selling agent for three of the mills without compensation, commissions earned thereon to be paid to such partner or his nominees, held, that commissions paid by such mills to family of partner were not taxable as "income" of partnership.

3. Partnership ⬨74—Partner may lend money or transfer property to firm, and enforce firm's agreement to repay in money on settlement of firm's accounts.

Though partner cannot sue for recovery of money loaned to firm, he may, in settlement of firm's accounts, compel its repayment, with interest, not as a share of profits, but as discharge of genuine loan; and same rule applies to transfers of property in consideration of promise to repay money, and it is immaterial whether payment is single or serial, or calculated on earnings of property, or fixed in advance.

4. Internal revenue ⬨38—Finding that agreement between partner and firm was not mere device to escape taxation held sustained by evidence.

Finding that agreement whereby partner in selling agency gave up right to 60 per cent. of gross receipts, in consideration for partnership acting as selling agent for three of the mills without compensation, commissions earned thereon to be paid to such partner or his nominees were not mere device to escape taxation, held sustained by evidence.

5. Taxation ⬨111—Nobody estops himself into paying taxes by failing in the past to assert his full rights.

Nobody estops himself into paying taxes by failing in the past to assert his full rights.

In Error to the District Court of the United States for the Southern District of New York.

Action by the New York Trust Company and others, as executor and executrices of the last will and testament of John C. Leslie, the last surviving partner of the copartnership of the Cannon Mills, against Frank K. Bowers, Collector of United States Internal Revenue for the Second District of New York. Judgment for plaintiffs, and defendant brings error. Affirmed.

See, also, 293 F. 822.

Writ of error to a judgment of the District Court for the Southern District of New York upon a directed verdict.

The action was to recover moneys from the collector of internal revenue of the Second district of New York for taxes paid under duress. The original plaintiffs were the two surviving partners of a firm doing business under the name of "Cannon Mills" and composed originally of three partners, Cannon, Leslie and Glynn. Cannon died before the action was brought, and during its pendency Leslie and Glynn died also. The present plaintiffs are the executors of Leslie, the last surviving partner.

Cannon had carried on business in the city of New York as selling and general commission agent for a great number of cotton mills. Among these was a group of 13, in which he or his family had a controlling interest, and which he called the "Cannon Group"; but he did business with 28 other mills as well, in which he had no such interest. Leslie and Glynn had been associated with him as assistants for some time, and on June 30, 1916, he formed a partnership with them under the firm name of "Cannon Mills," as stated above. The firm was to have a capital of $400,000, of which Cannon contributed $250,000, Leslie $100,000, and Glynn $50,000. Out of the gross yearly commissions received by the firm from the "Cannon Group," it was to pay Cannon 60 per cent. monthly before profits were calculated or divided. The partners were then to withdraw 6 per cent. upon the capital credited to each, and the net profits after these deductions were to be divided in proportions not necessary to state.

The firm began business at once, and continued the existing contracts with each of the mills under which it acted as its selling and commission agent, and the mill paid it stipulated commissions. So far as appears, there were no formal or written contracts with any of the mills, but it is to be considered that, after the organization of the firm,

direct contracts between it and the several mills arose by the manner of their business. Payments were made to Cannon monthly of 60 per cent. gross of all commissions received on such contracts from the "Cannon Group," through firm checks to the order of his nominee. An assessment of nearly $100,000 excess profits tax before May 1, 1917, proved that the firm's taxes were going to be high, and it is a fair inference that the changes effected by a new agreement of May 1, 1917, were for the purpose of avoiding these as much as possible.

This agreement recited the existing articles of partnership, and provided that the firm should continue as before to act as selling agent for all the mills referred to in the articles, of course including the "Cannon Group," but that the provision should be repealed by which Cannon was entitled, before profits were calculated, to 60 per cent. of the gross commissions received from that group. It further provided that the firm should be entitled to receive all commissions from all the mills except 3 of the "Cannon Group," which were named. As consideration for this change the firm promised to continue to act as selling and commission agent for the 3 named mills and not to charge any commission for the service. Cannon was to be free to make any contracts agreeable to himself and the 3 mills for the payment to him of commissions for the services of the firm, for which he should not be accountable.

On the same day separate contracts were signed between Cannon and the 3 mills. By them Cannon agreed that he would arrange with the firm that it should act as selling agent for the whole product of the mill, and the mill agreed to pay for this service stipulated commissions. Two of the contracts were executed by the mill's treasurer and one by its president. To each agreement, besides Cannon, 11 members of Cannon's family were parties, among whom the contract provided for a specified distribution of the payments. The contracts were sealed, but Cannon signed only one of them.

After May 1, 1917, the practice in respect of payments of the 3 mills continued as before. Each payment was made by check to the order of the firm, but accompanying each check was a letter stating that the amount was to be distributed in specified proportions between Cannon and the members of his family. These proportions were the same as those in the three agreements, and the firm in each case made distribution as directed in the letters.

The firm did not include in its income the proceeds of the checks so received, and the Bureau of Internal Revenue surcharged its income as returned with $660,257.77, their total amount between May 1 and December 31, 1917. Upon the surcharge an additional tax of $296,151.66 was assessed, which the firm eventually paid under protest, and to recover which, after unavailing efforts to change the ruling of the Bureau, it brought this action.

Emory R. Buckner, U. S. Atty., of New York City (Thomas J. Crawford and Nathan R. Margold, Asst. U. S. Attys., both of New York City, of counsel), for plaintiff in error.

Hughes, Rounds, Schurman & Dwight, of New York City (Charles E. Hughes, Arthur C. Rounds, George W. Schurman and Oscar R. Ewing, all of New York City, of counsel), for defendants in error.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). Taken formally there seems to us no doubt that the payments made after May 1, 1917, were not firm income. We reserve for the moment the question whether we must go behind the form. Cannon had by the original articles the right to demand of the firm 60 per cent. gross of the commissions coming from the "Cannon Group." This he surrendered, and got in its stead nothing but the firm's promise not to collect any payments under its contracts with the 3 named mills. We do not forget that he was also given freedom to deal with the mills as he chose, but the permission was of no moment, since the firm could neither bestow nor withhold it. This contract did indeed leave the firm's contracts with the mills untouched; as between itself and the mills, the firm was still bound to act as commission agent, and entitled to collect its commissions. There was no release, no novation, no accord.

[1] This, however, makes no difference in the result, because the firm had agreed with Cannon not to collect under its contracts with the mills and could not lawfully do so. It is difficult to see how Cannon had any remedy at law upon a breach of his contract with the firm. The mills' payments were not from his pocket and involved him in no loss. If so, he could have enforced the promise specifically by injunction. The most that can be said to the contrary is that the firm's collection of its commissions might in fact have prevented Cannon from making any contracts with

the mills, and that this would be a proximate damage for which he might sue. The point is extremely doubtful, and we think that Cannon had in fact power to prevent the collection. A legal remedy must be not only adequate, but clear.

[2] However, we find it unnecessary to decide that question. Even if he had not the power, it would have been a wrong had the firm collected the payments. We are concerned only with whether the payments actually made were paid under the firm's contracts, and there is no doubt that they were not. There is no suggestion that the firm violated its contract with Cannon, and no reason to assume that it did. On the contrary, the payments proved that it had not. While these were made by checks to the firm's order, the accompanying letters directed the distribution of the proceeds, and became conditions upon the firm's title if they cashed the checks. The money in its hands was in equity the property of the distributees, who could have held the firm accountable for its diversion. Whether or not the whole transaction was no more than a device through which the law will look, it was loyally carried out by all sides, and the payments were clearly not made under those contracts between the firm and the mills, which the firm had bound itself not to enforce. So we should hold, and in any case the question is not open after verdict.

Therefore, it makes not the slightest difference whether Cannon's contracts with the mills were authorized, or whether they had a valid consideration; the firm being already bound under its contracts with the mills to perform the duties of a commission agent. The payments may have been purely voluntary, and the result would be the same; they were not firm income, and could not lawfully be such, unless Cannon chose to release the firm. They are relevant at all, only as characterizing the payments and furnishing added proof, if any be needed, that the payments were not made under the firm's contracts. Therefore we do not find it important to consider some of the questions mooted in the argument. Taken formally, we have no doubt that the payments were not firm income.

A more difficult question is whether the whole arrangement was not a device to distribute firm profits to Cannon as partner by an elimination of the firm. Is the case like those in which the courts have held that guaranteed dividends paid direct to shareholders of a lessor company are payments to the company? Rensselaer & S. R. Co. v. Irwin, 249 F. 726, 161 C. C. A. 636; Blalock v. Georgia R. & E. Co., 246 F. 387, 158 C. C. A. 451; West End St. R. Co. v. Malley, 246 F. 625, 158 C. C. A. 581; Houston, etc., Co. v. U. S., 250 F. 1, 162 C. C. A. 278. Those cases regard a distribution to the constituent members (the shareholders) of the corporate entity as equivalent to a payment to the entity itself, and a distribution by it. We have no disposition to question their authority, nor do we mean to suggest that partnership transactions might not take on a similar character. To take the present case, one might suppose that the partners were to divide between them all the firm contracts with the several mills, and each was to make a contract with the firm not to collect any of the commissions due upon any of them. Acting upon such contracts, each might persuade the mills to pay him the commissions upon the contracts assigned to him, leaving the firm as the worker, while the partners, the drones, sucked the honey. It may well be that such an arrangement would be regarded as merely a device for sharing the profits, and that the commissions would remain firm income under the tax laws. For the purposes of argument we will assume that this is so.

[3] In ascertaining whether this was in fact what was done we must look at the situation before May 1, 1917. Certainly the contract of that date was intended to do no more than commute the former payments of 60 per cent. gross of the commissions from the "Cannon Group" into payments made direct to Cannon or his nominees. The argument cannot therefore apply, if the earlier payments were not, properly speaking, profits at all, but a discharge of firm obligations. Although he cannot sue for its recovery, owing to the repugnance of our law to regard a partnership as an entity, a partner may lend money to his firm, and, in the settlement of the firm accounts, he can compel its repayment, with interest, not as a share of his profits, but, as the discharge of a genuine loan. Henderson v. Ries, 108 F. 709, 714, 47 C. C. A. 625; Rodgers v. Clement, 162 N. Y. 422, 56 N. E. 901, 76 Am. St. Rep. 342; Winchester v. Glazier, 152 Mass. 316, 25 N. E. 728, 9 L. R. A. 424. The same rule must, of course, be true if the partner does not lend money, but transfers property of any sort in consideration of the firm's promise to repay him in money. Moreover, it must be immaterial whether the payment is single or serial, whether it is calculated upon the earnings of the property or is fixed in advance. Had Cannon required the firm to pay a series of fixed payments during the continuance of the articles, we

do not suppose that it would be seriously argued that they were not firm debts, though he could not sue to recover them, and they would be junior on dissolution to debts of third persons.

[4] Now it appears to be quite true that this part of the transaction embodied in the articles can appear only by inference, all the parties being dead. The question after verdict, however, is whether there was any adequate basis for the finding that the payments were reserved as consideration for the transfer of the business of the "Cannon Group," or whether they must be regarded as a part of Cannon's division of the profits. It seems to us that the facts justify and make almost certain the first conclusion. The 13 mills in question were Cannon's especial property; he controlled their management, was an owner of their shares, in many instances their president, and could turn their business as he would. When we find that he declined to allow the firm as such to divide as profits more than 40 per cent. of the gross returns from their business, it seems to us that only one conclusion is possible, which is that he did not mean to give the firm his whole business, or, what is the same thing, that he meant to require it to pay him 60 per cent. as a consideration for doing the business at all.

Besides, to call the agreement a preferential share in the firm profits appears to us altogether to ignore the form of the articles, which were executed at a time that forbids any suspicion that they were a cover to escape taxation. While in fact the probability was exceedingly remote, nevertheless they constituted a charge upon the firm which might have consumed not only all its profits, but have actually eaten into its capital. We see no reason to suppose that, if. that had happened, the firm could have refused payment; the undertaking is absolute, and has no relation whatever to profits. In any event it is quite wrong to speak of it as a preferential share in the profits, even if it should not be pressed to the extreme that we have suggested. It had no relation to profits, and was determined by the transactions of the firm with the group, regardless of how successful the general business might be. It was a charge upon that business, and indeed we need not even hold that it was created as consideration for the transfer of Cannon's good will.

[5] It is argued in reply that, if so, the payments were never firm income at all, and that either as a deduction for debts paid or as a diminution of income received they ought not

to have been included in the returns before May 1, 1917. Perhaps that is so, but at most it shows no more than that the firm has been less astute to protect itself than it might have been. Nobody estops himself into paying taxes by failing in the past to assert his full rights.

Therefore we do not regard the agreement of May 1, 1917, as changing into a new form an earlier division of profits, and the case does not fall within the hypothetical instance which we put. So far as we can see, it was no more than a change in the character of payments which never had been income, and which were not therefore taxable. That it was done for the purpose of evading taxation is at best immaterial.

Judgment affirmed.