**DENHOLM & McKAY REALTY CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 3873.

Circuit Court of Appeals, First Circuit.

Jan. 7, 1944.

546

Howe P. Cochran, Margaret F. Luers, and Betty Cochran Stocknis, all of Washington, D. C., for petitioner for review.

Arthur Manella, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John M. Morawski, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for the Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

The Commissioner of Internal Revenue determined against petitioner herein deficiencies in income and excess profits taxes for the year 1936 in the respective amounts of $6,714.41 and $3,437.24. These deficiencies resulted from the failure of petitioner to report as income the sum of $48,202 paid by another corporation in 1936 to petitioner's preferred stockholders in fulfillment of a guaranty of dividends. The Board of Tax Appeals upheld the Commissioner on the authority of United States v. Joliet & C. R. Co., 1942, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, and the taxpayer now petitions us for review of the Board's decision. The facts in the case are somewhat peculiar.[1]

The Denholm and McKay Company, which we shall hereinafter refer to as the store company, has since its organization in 1891 been engaged in operating a general department store in Worcester, Mass. Until August 31, 1916, it owned the buildings in which its business was conducted. At that time Luther C. Brown was its president and the owner of a majority of its voting stock.

In August, 1916, the Denholm and McKay Realty Company, hereinafter referred to as the petitioner, was organized with an authorized capital of 500 shares of common stock and 10,000 shares of preferred, the stock of both classes having a par value of $100 a share. The preferred stock called for cumulative dividends at the rate of 7% per annum, payable quarterly. It had no voting rights except when dividends were in arrears. The common stock of petitioner was at the outset owned by Luther C. Brown, who became its president. At some time prior to the taxable year 1936 all the common stock came into the ownership of the store company. Petitioner's original board of directors was composed of Luther C. Brown and two others, who were all also members of the board of the store company.

On August 31, 1916, the real estate on which the business was conducted was conveyed by the store company to petitioner in exchange for the 10,000 shares of petitioner's preferred stock. At the same time petitioner leased back the premises to the store company for a term of twenty-one years from September 1, 1916. The lease itself is not in the record, but it appears from a vote of the common stockholders of the store company and a parallel vote by the directors of petitioner, at meetings held on

---

1 We have referred to the record in the related case of Denholm and McKay Co. v. Commissioner of Internal Revenue, 39 B.T.A. 767; Id., 41 B.T.A. 986, which came to us on an earlier petition for review. Denholm & McKay Co. v. Commissioner,

1 Cir., 1942, 132 F.2d 243. The record in that case was introduced in evidence in the present case. See, also, Appeal of Denholm & McKay Co., 1925, 2 B.T.A. 444.

August 31, 1916, that the stipulated rental "shall be $264,000 per annum, payable in advance in installments of $22,000 a month."

The resolution adopted at the stockholders' meeting of the store company on August 31, 1916, contained this further provision:

"Voted in consideration of the lease of this Company of the premises now occupied by it from the Denholm & McKay Realty Company for a period of twenty-one years from Sept. 1st, 1916, heretofore mentioned in previous vote, and for other valuable considerations, that this Company guarantee the payment of dividends at the rate of seven percent per annum, payable quarterly on the outstanding preferred capital stock of the Denholm & McKay Realty Company amounting to one million dollars and the payment of one hundred and ten dollars a share in liquidation of said capital stock and that the said guaranty shall be in the following form and imprinted on the back of the certificate of said preferred shares of stock and signed by the President or Vice-President and Treasurer in behalf of this Company—

" '—Guaranty Agreement—

" 'Cumulative quarterly dividends amounting to seven percent per annum upon the par value of the outstanding preferred shares of the Denholm & McKay Realty Company, and in the event of liquidation, the payment of the sum of one hundred and ten dollars ($110) per share, and any secured and unpaid dividends thereon are guaranteed and will be paid by the undersigned.

" 'The Denholm & McKay Company
" 'by ———, President
" 'James Wilson Treasurer.' "

The store company executed the guaranty agreements printed on the back of the certificates of preferred stock of petitioner which had been issued to it. Thereafter the store company offered to exchange petitioner's preferred shares for its own outstanding preferred stock share for share. This offer was accepted by approximately one half the holders of preferred stock of the store company.

Since all preferred stock of petitioner was issued to the store company in payment for the real estate it seems that the only possible business purpose for the guaranty which the store company executed on the back of such preferred stock certificates was to facilitate the subsequent transfer of this stock by the store company.[2]

The original lease continued in effect until 1919 when the companies entered into a new lease. At that time the companies had gotten into financial difficulties. Brown resigned as president of the two corporations and new officers and directors were elected. "Sufficient of the common stock appears to have passed to the creditor banks to give them complete control of the corporations. It was found that the lease for the property occupied by the Store Co. imposed too great a financial burden on that corporation. The banks, however, agreed to lend the corporation additional money provided it could secure a modification or cancellation of the lease." 2 B.T.A. at page 446. A new lease was executed for a one-year term beginning February 1, 1919, with a rental of $120,000 plus an agreement by the store company to pay all taxes, water rates and insurance premiums on petitioner's real estate. The terms of this 1919 lease agreement are not in the record but it appears from a vote of petitioner's stockholders, authorizing the new agreement, that the 1916 lease was cancelled and the store company was released from all obligations thereunder to petitioner, "such release not to affect or include any obligations of the [store company] in connection with the preferred stock of the [petitioner]". This reservation appears to have been superfluous because the store company, having executed the guaranty on the back of the certificates of petitioner's preferred stock, necessarily remained bound thereon to the persons to whom it had transferred such certificates.

When the 1919 lease expired no renewal lease was executed and the store company

2 The Board's opinion in the present case refers back to a statement made by the Board in its opinion (not its findings of fact) in Denholm & McKay Co. v. Commissioner of Internal Revenue, 39 B.T.A. 767, 772, to the effect that the guaranty provision "was incorporated in the lease to secure more favorable terms for the [store company]. * * * It was an outright promise to pay, not made for the purpose of increasing the value of the [store company's] stock or of securing new capital." We find nothing in the record to support such a conclusion. The lease was not the product of arm's length bargaining. Luther C. Brown controlled both corporations, whose boards of directors were interlocking.

continued to occupy the premises for several years as a tenant at will.

Beginning in 1927 or 1928, and thereafter, the store company occupied the premises under annual leases from petitioner. The lease for 1936, the taxable year now in question, was apparently similar to the annual leases entered into for the previous years, and its terms are recited in the following vote of petitioner's board of directors:

"Voted to lease the property owned by this company to the Denholm, McKay Company, from January 1st, 1936, to December 31st, 1936, lessee to pay for rental of the property all taxes assessed on said property, or to the Denholm, McKay Company, including City, State and Federal Taxes, premiums on insurance placed on said property, the costs of all repairs, also amount of interest required or paid by this company on all of its outstanding indebtedness, both secured and unsecured, together with a sum equal to 7 per cent on the preferred capital stock of this company at this time issued and outstanding, the salaries of the company's officers and all other expenses of this company, such payments to be made as the several obligations of this company become payable, or at such time as the officers of the company may determine to be proper."

Pursuant to its obligations under the 1936 lease the store company paid directly to petitioner as lessor a total amount of $107,-487.80, all of which petitioner reported as gross income for 1936. This aggregate amount of $107,487.80 was the whole of the stipulated rent for 1936, computed in accordance with the lease for that year, and included a payment of $49,966, which represented a sum equal to 7% on the 7,138 shares of petitioner's preferred capital stock outstanding in 1936. Petitioner's balance sheet at the end of 1936 showed a deficit of $905,461.18, with an outstanding capital stock, preferred and common, of $763,800. Naturally, petitioner did not declare any dividends on its preferred stock during 1936. Though the agreed rent received by petitioner was made up in part by an amount "equal to" 7% on petitioner's outstanding preferred stock, petitioner was under no obligation to, and did not, pay out this amount as dividends to its preferred stockholders.

Petitioner having passed the dividends on its preferred stock in 1936, the store company, being obliged to fulfill its guaranty, paid to the holders of 6,886 preferred shares the sum of $48,202, the amount of the guaranteed dividend. (The small difference between this sum of $48,202 and the sum of $49,966, which had been paid directly to petitioner as part of the agreed rent, is due to the fact that the store company itself still held 252 shares of the 7,138 preferred shares outstanding.) The Commissioner and the Board have ruled that this amount of $48,202 should have been included as gross income in petitioner's income tax return for 1936 as rent received.

In the previous year a similar situation had arisen due to the fact that petitioner had failed to declare three of the four quarterly dividends on its preferred stock, as a result of which the store company had to pay directly to petitioner's preferred stockholders the sum of $36,150.50 in fulfillment of its guaranty of dividends. In Denholm and McKay Co. v. Commissioner of Internal Revenue, 39 B.T.A. 767, the store company's income tax for 1935 was in question, and the Board held that the store company was entitled to deduct as rent this sum of $36,150.50 paid on the guaranty. In the case at bar the Board member was much influenced by the logical consideration that if the sums paid by the store company in fulfillment of the guaranty were deductible in the store company's return as rent paid, then the same sums should be included by the petitioner in its report of gross income as rent received. Petitioner calls our attention to the fact that in that earlier case the store company claimed the deduction not as rent but as a deductible loss; and when the Board allowed the deduction, but for a different reason, naturally the store company did not appeal. The Government does not contend that the decision of the Board in that case to the effect that the payment of the guaranteed dividends was "rent", is a res judicata as far as the petitioner in the present case is concerned.

It is clear that the store company's possession of the premises in 1936 was not under the old 1916 lease, which had long since been superseded. Since 1927 the companies had made annual lease agreements. The full rent which the store company agreed to pay under the 1936 agreement was paid to petitioner as lessor and was reported by petitioner as part of its gross income for that year. The additional sum of $48,202 which the store company paid to petitioner's preferred stockholders in 1936 was

not part of the rent for that year. Such payment was made in pursuance of the store company's guaranty which it executed on the back of each of the certificates of preferred stock back in 1916 when it held the whole issue of preferred stock; when the store company subsequently sold the preferred stock to others, it became bound to such transferees on these individual contracts of guaranty. These guaranty obligations of course were not extinguished by the cancellation of the 1916 lease. The store company would have been bound to its transferees even if it were no longer tenant of the premises in 1936. On the other hand, the store company, having paid the stipulated rent in full in accordance with the 1936 rental agreement, could not have been evicted by petitioner for failure to fulfill the independent guaranty agreements. As a matter of law we hold that the sum of $48,202 was not part of the rent of the premises for 1936.

The Board in its opinion added that, even though the sum of $48,202 "were not properly classified as rent, still it would be income to the petitioner who profited in that its dividend was paid to its shareholders. United States v. Joliet & C. R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658." The Joliet case, we think, is distinguishable. There the only consideration which the lessee agreed to give for the occupation of the demised property was payment to the lessor's stockholders of an annual dividend of 7% on the par value of the shares. The court quite properly applied the principle of Lucas v. Earl, 1930, 281 U.S. 111, 50 S. Ct. 241, 74 L.Ed. 731, and held that since such payments were for the use and occupation of the lessor corporation's property they constituted income to the corporation despite the fact that the corporation had contracted that the rental payments should be made directly to its shareholders.

As the court pointed out, the rental payments could not lawfully have been made to anyone other than the lessor corporation without the latter's authority. The court was also fortified in its conclusion by a long-standing Treasury regulation which was plainly applicable to the case.[3] A contrary holding in the Joliet case would have afforded an easy method of tax avoidance. No such situation is presented in the case at bar. As we have seen, the 1916 lease provided for the payment of a cash rental of $264,000 direct to petitioner as lessor. This must have been the full rental value of the property at that time. The Treasury regulation does not cover the present case; there was no agreement by the lessee to pay the dividends on the lessor's stock "in lieu of other rental."[4]

■ Suppose the holder of ten shares of petitioner's preferred stock wants to sell the shares, and contracts with his transferee to guarantee the future payment of the dividends thereon. If payment is subsequently made to the transferee pursuant to the guaranty this is certainly not income to the corporation. This is not such a payment, as the one in the Joliet case, that could be made to the stockholders only on the authority of the corporation. In the present case, the store company at the time it made the guaranty was the holder of the whole issue of petitioner's preferred stock. But we do not perceive that this circumstance should make any difference in the result. The store company was still free to enter into such a contractual guaranty with its transferees, and to make payments to them in fulfillment thereof, without the concurrence or authority of the petitioner. Nor do we think that the essential nature of the transaction is altered by the fact that the store company, in its vote in 1916 authorizing the guaranty, stated, for some reason which is not apparent to us, that the

[3] The regulation to which the court referred was Article 70 of Treasury Regulations 74, promulgated under the Revenue Act of 1928, which provided in part:

"Where a corporation has leased its property in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock or the interest on the lessor's outstanding indebtedness, together with taxes, insurance, or other fixed charges, such payments shall be considered rental payments and shall be returned by the lessor corporation as income, notwithstanding the fact that the dividends and interest are paid by the lessee directly to the shareholders and bondholders of the lessor. The fact that a corporation has conveyed or let its property and has parted with its management and control, or has ceased to engage in the business for which it was originally organized, will not relieve it from liability to the tax."

The same regulation has continued in effect for the taxable year 1936 here in question. Treas. Regs. 94, Art. 22(a)-20 (promulgated under the Revenue Act of 1936).

[4] See footnote 3, supra.

550

guaranty was "in consideration of the lease". The payment of the sum of $48,-202 to the holders of 6,886 of petitioner's 7,138 outstanding shares of preferred stock did not constitute income to petitioner, either actually, theoretically or in contemplation of law.

We think that the issue in this case is not one in which the decision of the Tax Court is binding upon the reviewing court. Helvering v. American Dental Co., 1943, 318 U.S. 322, 63 S.Ct. 577. Perhaps we are wrong in this, in view of the latest decision of the Supreme Court in Dobson v. Commissioner, 64 S.Ct. 239, 249, decided December 20, 1943. Whether the Dobson case was intended to introduce a revolutionary limitation upon the scope of judicial review as previously understood and practiced, or merely to reemphasize that under the revenue act the decisions of the Tax Court may be reversed only if "not in accordance with law", 26 U.S.C.A. Int. Rev.Code, § 1141(c)(1), is a question which will no doubt perplex the circuit courts of appeals until further light is shed upon the Dobson case by later decisions of the Supreme Court. The question in the Dobson case, whether the payments which the taxpayer received in the taxable year constituted income to him or were in the nature of a return of capital, seems to have been regarded by the Supreme Court as merely an issue "of proper tax accounting" and, as such, a question of fact on which the Tax Court's decision is final if supportable on a rational basis. It does not seem to us that the issue in the case at bar, whether the payment to petitioner's preferred stockholders pursuant to the guaranty is income to petitioner, is a mere question of "proper tax accounting". It is certainly no more so than the issue involved in Helvering v. American Dental Co., supra. Furthermore, insofar as the Board's conclusion was not arrived at by an independent exercise of its own judgment but by the deference which it felt obliged to pay to the decision of the Supreme Court in the Joliet case, the Board's conclusion is not binding on us. Commissioner v. Heininger, 64 S.Ct. 249, decided December 20, 1943.

The decision of the Board of Tax Appeals (now the Tax Court of the United States) is reversed and the case is remanded to the Tax Court with directions to enter an order that there is no deficiency.