BROCKMAN BUILDING CORPORATION, INC., PETITIONER, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34866.   Promulgated November 4, 1953.

*A. Calder Mackay, Esq.*, and *Adam Y. Bennion, Esq.*, for the
petitioner.

*Charles H. Chase, Esq.*, for the respondent.

## OPINION.

Raum, *Judge:* 1. Petitioner is the lessee of a 12-story business building in Los Angeles known as the Brockman Building. Petitioner does not itself occupy the building. It subleases the space to a number of tenants, and, in effect, manages the property. The principal tenant for a number of years has been J. J. Haggarty Stores, Inc., a retail, woman's clothing store, which occupies the ground floor, basement, and several upper floors. In 1942, Haggarty entered into a new sublease providing for certain fixed rentals. Simultaneously, and as part of the same transaction, Haggarty also bound itself to pay a certain percentage of its gross sales, above a specified amount, to the Title Insurance and Trust Company, which, after deducting its trustee's fee, was to distribute the money thus received partly to two corporations to discharge an obligation running from petitioner to those corporations and the remainder to the named stockholders of petitioner in proportion to their stock interests. The principal question for decision is whether the payments made by Haggarty during the tax years under the percentage-of-sales agreement constituted income to petitioner. The controversy has its roots in a rather complex factual situation, but a summary statement will suffice for a consideration of the issue.

The Brockman Building is owned by the Security-First National Bank of Los Angeles as trustee under a trust that was established many years ago. For some years prior to 1933 it leased the building to Brockman Building Company, petitioner's predecessor, which was then hopelessly in default under the lease, and which was also obligated upon bonds in the aggregate face amount of $92,000 to Pacific Indemnity Company and Pioneer Securities Corporation. All of the rents from the subleases had been assigned as security for the benefit of those bondholders. In 1933, the bank terminated the lease, and, with the consent of the bondholders, the subleases were assigned to the bank. Petitioner was incorporated on July 28, 1933, and on the following day acquired from the bank a 28-year lease upon the building.

Under petitioner's lease, the initial rentals which it was obligated to pay were to consist of all of the gross receipts received from the subleases, less operating expenses, with provision that unless by July 31, 1942, the net rentals thus paid to the bank averaged $3,500 a month, the lease could be canceled, but that if such minimum were met, the rent would thereafter be fixed at $3,500 a month. The bank required, as a condition to the delivery of the lease, that petitioner obtain the consent of its predecessor's bondholders. Such consent was given by the bondholders upon petitioner's undertaking to purchase in a specified manner the $92,000 outstanding bonds at face amount; and, with the consent of the bank, the lease was assigned to the bondholders as security for this obligation.

Although petitioner paid substantial amounts to the bank as net rent each year, such amounts were considerably less than the average minimum of $3,500 a month specified in the lease. By the beginning of 1942, petitioner's "delinquency" had reached $102,686.86, and there appeared to be no prospect that the delinquency would be cured by the critical date, July 31, 1942. Meanwhile, the situation was complicated by the fact that the sublease of the principal occupant, Haggarty, was to expire in March 1942. Haggarty occupied not only its leased space in the Brockman Building, but also the space in the adjacent Macdonald Building, and by means of openings in the wall was able to operate its store as a unit in the two buildings. Its lease in the Macdonald Building was due to expire at about the same time, and it was imperative that it be assured of continued occupancy of its space in the Brockman Building if it renewed its lease in the Macdonald Building.

Negotiations looking towards the granting of a new lease to Haggarty were carried on by officers of petitioner for a period of about 2 years. Such negotiations were had with the knowledge of the bank. Although it was true that petitioner's basic lease from the bank was

subject to cancellation on July 31, 1942, for failure to meet the specified minimum average monthly rental, the negotiations of petitioner's officers with Haggarty were undoubtedly on the assumption that some arrangement would be worked out with the bank to prevent cancellation and to assure Haggarty of continued occupancy under its proposed new sublease. Indeed, the evidence discloses that petitioner's officers were in touch with the bank from time to time during this period and were placing before the bank a plan or plans for petitioner to continue as primary lessee, notwithstanding the delinquency in rentals. In essence, petitioner's bargaining position with the bank was that it was obtaining on behalf of the bank as much in the way of rent from the building as was possible in the circumstances and that its managerial services in general were satisfactory. To be sure, petitioner dealt with the bank at arm's length, and the evidence shows that there was not full cooperation between them at all times. But the situation nevertheless appears to have been such that petitioner could reasonably hope to work out some arrangement with the bank to continue as primary lessee beyond July 31, 1942, provided that a satisfactory sublease were obtained from Haggarty.

In their negotiations petitioner's officers succeeded in obtaining Haggarty's assent not only to a substantial increase in fixed rentals, but also to the payment of so-called contingent rentals measured by the excess of Haggarty's annual gross sales over $1,400,000. The plan which petitioner presented to the bank contemplated that the bank would get all of the rentals from the entire building, except the contingent rentals from Haggarty. Thus, the petitioner could look only to the contingent rentals, if any, as a source of profit or compensation for its efforts and services in connection with the Brockman Building. The bank did not object to the major outline of the plan, but it was opposed, in form, to having Haggarty's obligation for the contingent rentals made part of the sublease, for fear that a conflict of interest might arise at some later time by reason of having a "partner" in the transaction. Accordingly, the proposed transaction was modified in form, whereby the contingent rentals were removed from the Haggarty sublease, but whereby Haggarty simultaneously agreed to make contingent payments, measured in identical fashion, to the Title Insurance and Trust Company, as trustee. The Title Company, in turn, was required to distribute such payments, after deducting its trustee's fee, in the following manner: 55 per cent to the bondholders in proportion to their respective interests, until the full $92,000 should be paid; and the remainder to the named stockholders of petitioner in proportion to their respective stock ownerships. The various documents, including the Haggarty sublease, the modification of the bank's lease to petitioner, Haggarty's agreement with the Title Company as

to the contingent payments, the Title Company's declaration of trust in favor of the bondholders and named stockholders of petitioner, the assent of the bank to the contingent payments agreement, and the assent of the bondholders to the new arrangement, were all executed as parts of a single plan.

The payments actually made by Haggarty under its agreement with the Title Company were substantial, and in fact were sufficient to liquidate petitioner's obligation to the bondholders by June 1, 1945. The remaining amounts were distributed to the stockholders of peti-- tioner, except that during some of the years involved, one of the stockholders had assigned his interest in the trust, so that a portion of the payments allocable to his share became payable to another person not a stockholder.

Had the transaction been carried out as originally planned, namely, with contingent rentals payable directly to petitioner in the Haggarty sublease, there could be no serious question that they would constitute income to petitioner, notwithstanding any anticipatory assignment that petitioner might have made at that time to its creditors or stockholders. Cf. *United States* v. *Joliet & Chicago R. Co.*, 315 U. S. 44; *Lucas* v. *Earl*, 281 U. S. 111. And we think that the situation was not changed merely because the same transaction was cast in somewhat different form.

It is not accurate to say that Haggarty agreed to make these payments to the Title Company merely to obtain the assent of the bondholders and to compensate petitioner's stockholders for their efforts in bringing about the new sublease. The evidence before us shows not only that Haggarty, in its own records, treated these payments as rentals, but that to the extent that they were distributed to the bondholders they conferred a direct benefit upon petitioner by liquidating its obligation to them.[1] . Moreover, there is utter lack of proof that petitioner's stockholders, as individuals, were responsible for the consummation of the sublease. The evidence shows that the major burden of the negotiations was carried by John Shirley Ward and Chandler P. Ward, two officers of petitioner, whose stock interest in petitioner was only 8½ per cent each. There is no evidence that the other stockholders were responsible for bringing about the transaction. And we are satisfied that John Shirley Ward and Chandler P. Ward were acting as officers of petitioner rather than as individuals or as stockholders with an 8½ per cent interest each.[2] Certainly we

[1] That part of the percentage payments that was paid to the bondholders was recognized by the Commissioner as a cost attributable to petitioner's basic lease, and he has allowed amortization of such amount over the life of the lease.

[2] There is considerable evidence in the record to support this conclusion, and we deem it unnecessary to set it forth. However, one consideration calls for special mention. If the two Wards were acting as individuals, on behalf of themselves, their position would have been antagonistic to that of petitioner in which they were officers. Indeed, at a

cannot accept as a fact that the stockholders of petitioner, as individuals and in proportion to their stock interests, performed services for which they were to receive compensation through the contingent payment arrangement. Indeed the evidence strongly suggests that one of the largest stockholders resided in New York and that she rendered no services whatever in this connection. The truth of the situation, as we read the evidence, is that it was petitioner, acting through several of its officers, that became entitled to the contingent payments from Haggarty; and it arranged in advance to have those payments applied to discharge its obligation to the bondholders and to pay the remainder to the only other persons interested in its affairs, namely, its stockholders in proportion to their stock ownership.

We agree with the Commissioner that his position is in accord, in principle at least, with section 29.22 (a)–19, Treasury Regulations 111,[3] and *United States* v. *Joliet & Chicago R. Co.*, *supra*, which sustained the validity of an almost identical regulation.

In the *Joliet* case, the taxpayer in 1864 leased all of its railroad property to another railroad, in perpetuity. In consideration for such lease, the lessee agreed to pay a 7 per cent annual dividend to the stockholders of the taxpayer. In addition the lessee agreed to pay all income taxes of the lessor which might arise on account of such dividend. As security for those promises, the lessee pledged, to the taxpayer, portions of its property. The Supreme Court, on such facts, held that the dividend payments made to the stockholders during the tax years in controversy were income to the lessor-taxpayer, regardless

meeting of petitioner's board of directors on July 3, 1941, when David Blankenhorn, who was not then a stockholder, resigned as president and gave notice that he might personally seek a commission from Haggarty for negotiating a new lease, both John Shirley Ward and Chandler P. Ward questioned the propriety of such action, and it was pointed out "that if Mr. Blankenhorn entered into an agency relation with the prospective tenant he must expect to be treated by this company in such negotiation just as it would treat any other outside agent (at arm's length)—he could not be on both sides of the same deal." As to the subsequent position of the two Wards, there is no evidence whatever that either of them was acting at arm's length in relation to petitioner or was in any way violating his trust as an officer of petitioner in favor of his own private interests. To the contrary, the evidence is only too plain that each of them was vigorously and conscientiously acting as an officer of petitioner and seeking to promote its best interests.

[3] Regulations 111:

Sec. 29.22 (a)–19. INCOME TO LESSOR CORPORATION FROM LEASED PROPERTY.—If a corporation has leased its property in consideration that the lessee shall pay in lieu of other rental an amount equivalent to a certain rate of dividend on the lessor's capital stock or the interest on the lessor's outstanding indebtedness, together with taxes, insurance, or other fixed charges, such payments shall be considered rental payments and shall be returned by the lessor corporation as income, notwithstanding the fact that the dividends and interest are paid by the lessee directly to the shareholders and bondholders of the lessor. The fact that a corporation has conveyed or let its property and has parted with its management and control, or has ceased to engage in the business for which it was originally organized, will not relieve it from liability to the tax. While the payments made by the lessee directly to the bondholders or shareholders of the lessor are rentals as to both the lessee and lessor (rentals paid in one case and rentals received in the other), to the bondholders and the shareholders such amounts are interest and dividend payments received as from the lessor and as such shall be accounted for in their returns.

of the anticipatory arrangement which provided for the direct payments to the stockholders rather than to the lessor-taxpayer and the subsequent declaration of a dividend. The result thus reached was not novel; it was not predicated upon attempting to frustrate a tax avoidance scheme, the lease having been executed in 1864; and it was in accord with similar results already reached in a variety of other cases (e. g., *Gold & Stock Telegraph Co.* v. *Commissioner*, 83 F. 2d 465 (C. A. 2), certiorari denied 299 U. S. 564; *United States* v. *Northwestern Telegraph Co.*, 83 F. 2d 468 (C. A. 2), certiorari denied 299 U. S. 565; *Pacific & Atlantic Telegraph Co.* v. *Commissioner*, 83 F. 2d 469 (C. A. 2), certiorari denied 299 U. S. 564; *American Telegraph & Cable Co.* v. *United States*, 61 Ct. Cl. 326, certiorari denied 271 U. S. 660; *Blalock* v. *Georgia Ry. & Electric Co.*, 246 F. 387 (C. A. 5); *Rensselaer & S. R. Co.* v. *Irwin*, 249 F. 726 (C. A. 2), certiorari denied 246 U. S. 671; *Northern R. Co. of New Jersey* v. *Lowe*, 250 F. 856 (C. A. 2); *West End St. Ry. Co.* v. *Malley*, 246 F. 625 (C. A. 1), certiorari denied 246 U. S. 671; *Terre Haute Electric Co.*, 33 B. T. A. 975; *Kansas City, St. Louis & Chicago Railroad Co.*, 42 B. T. A. 1163; cf. *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716; *United States* v. *Boston & M. R. Co.*, 279 U. S. 732; *Raybestos-Manhattan, Inc.* v. *United States*, 296 U. S. 60).

Petitioner relies upon *Denholm & McKay Realty Co.* v. *Commissioner*, 139 F. 2d 545 (C. A. 1). We do not read that decision as undertaking to lay down a rule different from the general rule applied in the *Joliet* case. The situation in the *Denholm* case was unusual, and the Court of Appeals itself at the outset commented that "The facts in the case are somewhat peculiar." 139 F. 2d at p. 546. Among other things, the taxpayer corporation and the corporation guaranteeing the dividends on the taxpayer's preferred stock were subject to control by the same person at the time the arrangement in controversy was adopted; the preferred stock was then held by the guarantor corporation; and it was then the intention of the guarantor corporation to exchange such preferred stock for its own outstanding preferred stock, thus in effect guaranteeing its own preferred stockholders a specified dividend through the medium of the taxpayer corporation's preferred. We mention these unusual aspects of the *Denholm* case not because any one of them is to be singled out as the crucial factor upon which the case should be regarded as resting, but rather because the peculiar situation there presented sets the case apart from the general rule applied in the *Joliet* case. To be sure, petitioner urges upon us a number of differences between the present case and the *Joliet* case. However, we have examined them carefully and do not find any of them persuasive. They are in general of a formalistic character comparable to the considerations relied upon by the Court of Appeals in

the *Joliet* case itself (118 F. 2d 174) which were rejected by the Supreme Court.

Petitioner's position as to its status was described in its 1942 and 1943 income tax returns, which referred to the new Haggarty sublease and the modification of its own basic lease from the bank on March 3, 1942, and stated:

The effect thereof was that taxpayer became a management corporation without compensation for its management, and its creditors lost any possibility of the payment of their claims, and its stockholders lost any possibility of enjoying any net income or dividends from its operations.

This was an incredible ultimate conclusion. Petitioner did arrange to receive compensation. After extensive negotiations, its compensation was to be the percentage rentals which Haggarty agreed to pay, and to which the bank did not object provided the arrangement were cast in an acceptable form. The form finally worked out made use of the Title Company as trustee, and the contingent rentals, now described merely as contingent "payments," were to be funneled through the Title Company to discharge petitioner's obligation to the bondholders and then to be distributed to petitioner's named stockholders in proportion to their stock interest. It strains credulity to suggest that petitioner became "a management corporation without compensation for its management."

Petitioner makes much of the fact that one of the stockholders subsequently assigned his fractional interest in the trust so that one-half of the payments to be made with respect to that fractional interest was thereafter made to Harold Morton who was not a stockholder of petitioner. We think that this circumstance does not change the result. The payments were initially dedicated to petitioner's named stockholders (after provision for the bondholders) in proportion to their stock interest. The fact that one of them subsequently assigned a portion of his dividends to a stranger could not change the quality of the payments.

Petitioner also stresses the fact that in a proceeding brought by Morton against petitioner it was adjudged that as between them petitioner was without any right, title, or interest in the share of the Title Company trust that had been assigned to Morton. Wholly apart from any question that might arise from the nonadversary character of the proceeding in which such judgment was rendered (cf. *Estate of Ralph Rainger*, 12 T. C. 483, 495 *et seq.*, affirmed 183 F. 2d 587 (C. A. 9), certiorari denied 341 U. S. 904; *Estate of Edith Wilson Paul*, 16 T. C. 743, 745; *Saulsbury* v. *United States*, 199 F. 2d 578, 580 (C. A. 5)), it is abundantly plain that it can have no effect on the present controversy. Of course, there is no reason to question Morton's rights in the assignment that was made to him, any more than there was

reason to question the fact that the taxpayer in the *Joliet* case parted with all interest in the demised premises. And the decree of the California court here can have no more effect on the outcome of this case than the judgment of the Illinois court in the *Joliet* case. Indeed, the judgment of the Illinois court was relied upon by the Court of Appeals in that case, see 118 F. 2d 174, 176, but the Supreme Court, in reversing the Court of Appeals, made it clear that "Such considerations do not dispose of this controversy." 315 U. S. at p. 46.

2. The petitioner also raises an issue as to whether the statute of limitations has run on the tax years in controversy prior to 1946. The petitioner executed consents to extend the period of limitations for 1944 and 1946, which were expressly stipulated to be effective only if section 275(c) of the Internal Revenue Code [4] is applicable to those years. This issue then depends also on the resolution of the main issue.

Since we have determined that the percentage payments made by Haggarty to the Title Company were income of the petitioner and were not reported by petitioner, we must only decide whether or not such payments exceeded 25 per cent of petitioner's gross income, as reported. The percentage payments made by Haggarty to the trust during 1944 and 1945 were $66,971.24 and $92,662.53, respectively. Petitioner, for the same years, reported $21,532.42 and $176,615.64, respectively, as it gross income. The unreported amounts are far in excess of the requisite 25 per cent of the reported amounts and section 275(c) therefore applies, rendering the extensions of the period of limitations effective.

3. The respondent determined that, under the provisions of section 291 (a) of the Code,[5] petitioner was liable for a 25 per cent addition to tax because of its failure to file timely excess profits tax returns, for the years 1942, 1943, 1944, and 1945. Such returns were not filed

---

[4] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.
Except as provided in section 276—

\* \* \* \* \* \*

(c) OMISSION FROM GROSS INCOME.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

[5] SEC. 291. FAILURE TO FILE RETURN.
(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 361 (d) (1):

until September 29, 1950. This determination must be considered correct unless petitioner establishes that the failure to file such returns was due to reasonable cause and not to willful neglect.

The Commissioner further determined that the failure of the petitioner to report the percentage payments made by Haggarty was due to negligence or intentional disregard of rules and regulations and that the petitioner was liable for the 5 per cent addition to the deficiency prescribed by section 293 (a) of the Code.[6] Petitioner's liability for these proposed additional assessments turns on whether it acted in good faith in not including the percentage payments in its gross income.

We think that the Commissioner erred in determining that petitioner is liable for additions to tax under sections 291 (a) and 293 (a). Petitioner attached to its corporate income tax and declared value excess-profits tax returns for 1942 and 1943 a rider explaining the basic outline of the transactions involving the Haggarty trust, although it was inaccurate in one important conclusion. The returns were prepared by a certified public accountant and we think that, in view of the statement made in connection with these returns, petitioner has shown enough to establish that it acted in good faith in not reporting the percentage payments as its income. Cf. *Pullman, Inc.,* 8 T. C. 292, 299. Similarly, we think that this bona fide belief that the payments were not taxable as its income was reasonable cause for petitioner's failure to file its excess profits tax returns according to law. Without the inclusion in income of the percentage payments, petitioner's excess profits credit was sufficient to eliminate any tax due. It would be unnecessary therefore to file a return and petitioner acted accordingly.

*Decision will be entered under Rule 50.*

---

[6] SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

(a) NEGLIGENCE.—If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.