IRVINE F. BELSER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97873. Promulgated June 7, 1948.

*Clint T. Graydon, Esq.*, for the petitioner.
*F. L. Van Haaften, Esq.*, for the respondent.

OPINION.

JOHNSON, *Judge*: 1. Petitioner charges the Commissioner with error in failing to allow as a deduction "a loss sustained or bad debt obligations determined to be worthless in the amount of $24,000, due to petitioner's investments in stock of the Fairview Farming Company and/or indebtedness due to him from the said corporation or growing out of certain real estate transactions involving the purchase of two tracts of land known as DePriest and Stewart tracts." He computes the $24,000 as follows:

| | |
|---|---:|
| Investment in 200 shares of stock | $14, 400 |
| Loan secured by second mortgage on Stewart tract | 5, 000 |
| Loan secured by third mortgage on Stewart tract | 3, 500 |
| Loan secured by second mortgage on DePriest tract | 1, 000 |
| Advance on open account | 100 |
| Total invested and loaned | 24, 000 |

The computation would appear to be an oversimplification of petitioner's investment in and loans to the company, but if the impact of numerous complicated transactions on the investment and loans is ignored, the record supports and we have found that, in acquiring the entire 200 shares issued, petitioner did pay for each 50 share certificate $3,600, or a total of $14,400, and he did make the three loans secured by mortgages, aggregating $9,500. There is no evidence regarding the $100 on open account.

To support the claimed deduction, petitioner must prove that the shares and loans became worthless in 1932, and not in some prior year, as respondent argues. The question is one of fact, and the facts established, in our opinion, indicate conclusively that the shares and loans not only became worthless in a year prior to 1932, but also that the company had been effectively liquidated some time before the revocation of its charter in 1926. The only assets that it ever owned were the DePriest and Stewart tracts acquired by purchase in 1920 and encumbered by mortgages for $13,333.33 and $10,000, respectively, or over half of their aggregate price of $41,202.50. As only $14,400 cash is shown to have been paid into the company as capital (there being no evidence that the four stock subscribers' notes for $1,400 each were ever paid), it is to be inferred that petitioner advanced the approximate $3,500 additional paid for the tracts.

To hold the tracts, the company for a short time continued to borrow, mortgaging them as security. Then on July 27, 1922, it conveyed the DePriest tract to petitioner. It was then subject to a second mortgage to him, securing the $1,000 loan here in controversy, and to a third mortgage, securing a $5,000 loan. But on July 31, 1922, petitioner conveyed the tract by a first mortgage deed to a bank to secure

a $7,200 loan used to pay off the balance of the purchase price. He conveyed it, still mortgaged, to Fairview in 1930; Fairview (after revocation of its charter) conveyed it to his wife in 1934; and petitioner acquired it by devise upon his wife's death in 1942.

The Stewart tract was the subject of similar shifts. Prior to 1924 it had been encumbered by a first mortgage to secure a $10,000 bank loan and to second and third mortgages to petitioner, securing the $5,000 and $3,500 loans here in controversy. After a judgment for $22,381.92 had been entered against petitioner in favor of the National Loan & Exchange Bank, which held the company's shares as collateral, petitioner had the company convey the Stewart tract to the bank on January 15, 1924, and there title remained until February 28, 1930, when, pursuant to the terms of petitioner's general settlement with the bank as judgment creditor, the bank conveyed the tract to Fairview on petitioner's undertaking to pay $20,000 to the bank "as purchase price," secured as to $18,500 by a first mortgage on the tract, other mortgage liens on it being removed. On July 22, 1937, Fairview conveyed it to petitioner.

From this review of the facts, it is obvious that since January 15, 1924, the company has owned no assets whatever. When its charter was revoked in 1926, there was nothing to liquidate; the shares had no value, and no liquidator has since acquired anything for the payment of creditors or for liquidation. Recognizing these facts, petitioner argues that he "held lands and assets as trustee for the corporation's stockholders and creditors down to 1932," as is required of directors, after a corporation has been dissolved, by section 7710 of the Code of South Carolina, 1932. But obviously petitioner was not holding any lands or assets in 1932 as trustee or otherwise for the corporation. Both tracts were then held by Fairview, which had acquired one from petitioner and the other from a bank to which it had been transferred in consequence of a judgment not against the company, but against petitioner. We could believe that initially the conveyance of the DePriest tract to petitioner for facilitating a mortgage loan was in furtherance of the company's interest, but any inference that a fiduciary character attached to his title is rebutted by the subsequent conveyance to Fairview. The tract was never reconveyed to the company, and petitioner did not again get title to it until his wife's death in 1942. The Stewart tract was conveyed to the bank, which obviously did not take title for the company's benefit, and the bank conveyed it to Fairview for a cash consideration paid by petitioner and described as "purchase price."

Petitioner contends on brief that his loans to the company were bad debts, deductible in 1932. The $1,000 loan was secured by a second mortgage on the DePriest tract, which petitioner acquired in 1922, and conveyed to Fairview eight years later. Under date of July 30, 1937,

he wrote across the face of the bond and mortgage "Cancelled and charged off in 1932," but we have not based a finding on this exhibit, for the notation had no effect. By acquiring the mortgaged land in 1922, petitioner's mortgage interest became presumptively merged in his title to the fee, *Thompson* v. *Hudgins*, 161 S. C. 450; 159 S. E. 807, and nothing shown rebuts the presumption. *Gainey* v. *Anderson*, 87 S. C. 47; 68 S. E. 888. On the contrary, he conveyed full title to the tract in 1930. The record does not disclose any affirmative act of cancellation, and indicates further that in 1932 there was nothing to cancel.

The loan for $5,000 was secured by a second mortgage on the Stewart tract, which petitioner in 1937 likewise marked "Redeemed and Cancelled and Charged off in 1932," but we can not find that this was done in 1932. The mortgage note was included in the collateral placed with the bank in 1921 for security of petitioner's personal loans. In the settlement agreement of July 6, 1929, the bank agreed to convey the Stewart tract to petitioner's appointee, subject to a first mortgage in its favor securing payment of $18,500, and to cancel and satisfy the first mortgage of the insurance company, dated December 4, 1920, "as well as the mortgage of Fairview Farming Company to Irvine F. Belser, dated December 15, 1920" for $5,000. Petitioner in turn agreed to cancel the third mortgage on the tract, securing payment of the company's note to him for $3,500, and he did so on February 28, 1930.

It is thus apparent that by February 28, 1930, all three mortgages were canceled or extinguished, and petitioner had no security for his three loans. As the corporation had no property and never acquired any later, petitioner's loans to it and his investment in stock became worthless prior to 1932.

In reaching this conclusion, we find it unnecessary to consider petitioner's evidence to the general effect that the price of cotton and value of real estate were very low in 1932, so that, as he argues, the worthlessness of his shares and mortgage notes occurred in that year. And we find no merit in his contention that the several conveyances by him were void as a breach of trust against creditors and shareholders. He was sole shareholder and, after 1930, so far as shown, there were no creditors except himself.

The Commissioner correctly failed to allow any deduction in 1932 on account of petitioner's investment in and loans to the company.

2. Petitioner assails the Commissioner's inclusion in taxable income of $1,666.64 which he received from the State of South Carolina in 1932 as compensation for services rendered as special counsel for the State's Railroad Commission. Prior to the decisions of the Supreme Court in *Helvering* v. *Gerhardt* (1938), 304 U. S. 405, and *Graves* v. *People of State of N. Y. ex rel. O'Keefe* (1939), 306 U. S. 466, com-

pensation paid to officers or employees of a state government were not subject to tax by the Federal Government, and *vice versa*. After those decisions, this limitation on the taxing power was no longer recognized. By Title II, section 201, of the Public Salary Tax Act of 1939, 53 Stat. 574, however, Congress provided for the abatement, credit, or refund of income tax upon "compensation for personal service as an officer or employee of a state," received prior to 1938. But:

* * * The Act did not create an immunity from federal taxation, but merely protected one which had existed under abandoned interpretations of the law. *Coates* v. *United States, supra* [11 Fed. (2d) 609 (C. C. A., 2d Cir.)]; *Meigs* v. *United States*, 1 Cir., 115 Fed. 2d 13; *La Rochelle* v. *Commissioner, supra* [115 Fed. (2d) 878 (C. C. A., 7th Cir.)]. [*Lohman* v. *Commissioner* (C. C. A., 8th Cir.), 133 Fed. (2d) 977.]

We shall, therefore, consider whether or not the salary received by petitioner was tax-exempt under the interpretations prevailing in 1932.

The evidence indicates that he was appointed by the Attorney General to advise the Railroad Commission on any matters arising and to represent it in litigation. He was subject to general supervision of the Attorney General, but, as a lawyer, exercised independent judgment in handling the cases assigned him. He remained engaged in private law practice, and the compensation paid him by the state was only a small part of his professional earnings for the year. On this showing we must deem him not a state officer or employee, but an independent contractor with the state, and as such his compensation was not exempt in 1932. Cf. *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514; *Commissioner* v. *Modjeski* (C. C. A., 2d Cir.), 75 Fed. (2d) 468; *Register* v. *Commissioner* (C. C. A., 5th Cir.), 69 Fed. (2d) 607; *Haight* v. *Commissioner* (C. C. A., 7th Cir.), 52 Fed. (2d) 779; *Burnet* v. *McDonough* (C. C. A., 8th Cir.), 46 Fed. (2d) 944; *Blair* v. *Byers* (C. C. A., 8th Cir.), 35 Fed. (2d) 326; *J. E. Huckabay*, 40 B. T. A. 9.

3. Petitioner contests the determination that he derived $28,950 as a fee for representing the State of South Carolina, the city of Columbia, and other municipalities in litigation to force a street railway company to resume transportation service, alleging that the correct taxable amount is $26,500. He was one of several attorneys engaged; the litigation extended over a period of six years, ending in 1933; it involved many hearings, and corollary issues arose after the principal issue was decided. On December 16, 1931, the State Supreme Court approved a fee of $60,000 for legal services rendered to the state and city, chargeable against the defendant, and by agreement among the attorneys petitioner's share was fixed at 55 per cent. The fee was paid in 1932, but as $5,000 had been previously advanced by the city, this amount was refunded, leaving $55,000 for division and $30,250 as

petitioner's share, from which he paid his brother $2,000 for services and retained $28,250 himself.

He contends, however, that from this amount $1,750 should be deducted as representing expenses paid and incurred by him which the court disapproved for reimbursement, although it did approve others. As framed, the issue requires a determination of gross fee rather than deductions for expenses. We have found that the amount which petitioner received in the division of the fee was $700 less than the Commissioner determined, but, since all of the amount was awarded as compensation and no part of it as reimbursement for expenses, a disposition of the question presented involves petitioner's right to a deduction. He offered, however, no itemized list of disbursements, but, after specifying two printing bills aggregating $497.50, extra compensation of $100 to his secretary, and an engineering bill of $571.90 (which the deficiency notice shows has in fact been allowed), petitioner estimated that his travel expenses alone amounted to about $1,800, and he urges the Court to accept the figure of $1,750 as a very modest and conservative claim.

To support the right to a deduction of expenses, the taxpayer should furnish proof as full and definite as is reasonably possible. His mere estimate of amounts claimed and opinion testimony that such amounts are proper business expenses fall short of the full disclosure of facts which is normally requisite to warrant a finding in his favor. *Birmbaum* v. *Commissioner* (C. C. A., 7th Cir.), 117 Fed. (2d) 395; *O'Laughlin* v. *Helvering*, 65 D. C. App. 135; 81 Fed. (2d) 269; *Charles P. Noell*, 21 B. T. A. 1107. The rigidity of this rule, however, has been relaxed in many cases wherein the evidence establishes conclusively that a taxpayer did incur and pay business expenses in the taxable year, but has no records to prove the exact amount. *Cohan* v. *Commissioner* (C. C. A., 2d Cir.), 39 Fed. (2d) 540; *Maurice P. O'Meara*, 8 T. C. 622; *Lucien I. Yeomans*, 5 T. C. 870; *John J. Ide*, 43 B. T. A. 799. Under such circumstances, the court:

* * * should consider all the evidence in the light of its general experience and make such allowance for the sums expended as it conscientiously feels would represent fair and reasonable expenses for such ordinary and necessary purposes in the circumstances of the taxpayer's business. * * * [*Rugel* v. *Commissioner* (C. C. A., 8th Cir.), 127 Fed. (2d) 393.]

We can readily believe that petitioner did incur and pay substantial expenses on account of printing, travel, investigation, and stenographic work in the course of the litigation. But, for estimating the amount or accepting his estimate, we are confronted with the fact that the expenses claimed are only those which the South Carolina Supreme Court did not approve as chargeable against the defendant and which presumably had been at least incurred when its decision

was rendered in December 1931 and hence prior to the taxable year 1932. As petitioner reports income on the cash basis, expenses paid prior to 1932 are not deductible. The litigation had begun in 1927, and by the end of 1931 it was nearing completion. It strains credulity to believe that any substantial part of the expenses remained unpaid for years. Indeed, petitioner admitted that most of the travel expense (estimated at $1,800) were incurred and paid before 1932.

We can make no estimate whatever on this record, for not only do we lack evidence of amount, but doubt is cast on the character of the expenses as ordinary and necessary by the court's disallowance of them, and we are convinced that the greater part, e. g., the travel expense, was paid prior to 1932, despite petitioner's statement that he "actually paid out most of it that same year 1932." We do find and hold, however, that the $497.50 for printing and $100 extra compensation for his secretary, which he recalled specifically among bills paid in 1932, are deductible, and we further hold that the portion of the $60,000 fee received by petitioner was $28,250 and not $28,950, as determined.

4. Petitioner contests the 25 per cent delinquency penalty which the Commissioner proposes to assess by virtue of section 291, Internal Revenue Code, on the ground that petitioner "failed to file an income tax return within the time prescribed by law." Section 291, Revenue Act of 1932, imposed the penalty in case of a taxpayer's failure to file:

\* \* \* except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to the tax. \* \* \*

On March 14, 1933, the day before the final date for filing, petitioner requested and procured from the collector a month's extension of time, and by subsequent requests the period for filing was extended to September 15, 1933. Being then busily engaged in the preparation and trial of an important case, he requested a further extension, which could not be granted, but the revenue agent suggested that he submit an explanatory affidavit on filing the return late.

Petitioner introduced persuasive evidence that he prepared a 1932 return on September 27, 1933. This evidence consisted of rough pencil entries on a return form, said to be the original draft; a work sheet of computations showing figures appearing on the draft; carbon copy of four pages explanatory of deductions claimed, attached to the draft; carbon copy of a letter, addressed to the collector and dated September 27, 1933, referring to the refusal to extend time and the suggestion that an affidavit be filed with a later return. At the bottom of the letter is a form of oath as to the truth of the statements in the letter with provision for notarial service; an entry on a check stub indicates that a check for the amount of the tax shown due plus interest was drawn in

the collector's favor on September 27, 1933, and reference to the check appears in the carbon copy of the letter.

We do not doubt that a return was prepared at the time alleged, but evidence that it was mailed is not convincing. Petitioner's secretary testified that she "probably would have mailed it right away, the same day. In fact, I'm sure I would have." And, while she made an affidavit in 1935 that she had dropped it in a mail box at the National Loan & Exchange Bank, the qualified manner of her testimony on the witness stand indicates rather an inference of mailing based on her custom in the discharge of duties rather than specific recollection in respect of this item. When the revenue agent made inquiry about the 1932 return in 1935, she made a search for the check and inquired at the bank, but found no evidence that the check had been presented or cashed, and petitioner has not produced the canceled check or any bank statement showing a charge of his account in the amount of the check. About two years after the revenue agent's call and in 1937 petitioner tendered a 1932 return, showing the same tax due as indicated on the pencil-filled form offered in evidence, and at the same time an amended return which showed no tax due for 1932 by elimination of the $1,666.64 received from the state, as nontaxable income. These tendered returns were stamped received by the collector on July 12, 1937, but were not used as a basis for determination of the deficiency, it being stated in the notice that no return was filed.

In support of his contention that a 1932 return was filed on September 27, 1933, petitioner cites *Crude Oil Corporation of America* v. *Commissioner*, 161 Fed. (2d) 809, in which the Circuit Court of Appeals for the Tenth Circuit, reversing 6 T. C. 648, held that the presumption of correctness attaching to the Commissioner's determination was overcome by a presumption that a mailed return had been delivered to the collector. As we can not affirmatively find that petitioner's return was mailed, however, disposition of the issue now before us does not involve the conflict of presumptions therein considered. And, not finding that a 1932 return was filed on September 27, 1933, we need not consider petitioner's further contention that a filing on such date, being a few days after expiration of the statutory period as extended, was due to reasonable cause and not to willful neglect. Imposition of the 25 per cent penalty is, therefore, approved.

*Decision will be entered under Rule 50.*