BROCKMAN BUILDING CORPORA-
TION, Inc., a corporation,
Petitioner,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 14363.

United States Court of Appeals
Ninth Circuit.

Sept. 27, 1955.

Rehearing Denied Oct. 25, 1955.

Writ of Certiorari Denied
Jan. 9, 1956.

See 76 S.Ct. 308.

MacKay, McGregor, Reynolds & Ben-
nion, A. Calder MacKay, Stafford R.
Grady, Adam Y. Bennion, Los Angeles,
Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen.,
Hilbert P. Zarky, Ellis N. Slack, Meyer
Rothwacks, Special Assts. to Atty. Gen.,
John Potts Barnes, Chief Counsel, Int.
Rev. Service, Chicago, Ill., Walter Aker-
man, Jr., Tax Division, Department of
Justice, Washington, D. C., for appellee.

Before POPE, FEE and CHAMBERS,
Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

The petition for review of the deter-
mination of the Tax Court involves de-
ficiencies in income, declared value ex-
cess profits tax and excess profits tax
for the taxable years 1942 to 1949, inclu-
sive.

The question presented is whether the
Tax Court correctly held that payments
made by the sublessee of the taxpayer,
through the medium of a trust, directly
to the stockholders and bondholder-cred-
itors of Brockman Building Corporation,
petitioner here, constituted part of the
rental owing by the sublessee under a
percentage of sales agreement and were
income to the taxpayer.

In 1933, the Security-First National
Bank of Los Angeles, owner, as trustee
under a trust established in 1922, leased
the Brockman Building to petitioner for
twenty-eight years. The lessee did not
occupy the premises, but subleased them.

In the lease, it was provided petitioner would pay to the Bank all gross receipts, less certain listed operating expenses. The lease was subject to cancellation if net rentals from March 1, 1933, to July 31, 1942, did not average $3,500.00 per month, but, if that average had been attained, the net rental after July 31, 1942, would be fixed at $3,500.00 per month and petitioner was to retain any excess rental it was able to secure. Petitioner, however, not only failed to realize the average of $3,500.00 per month, but was by January 1, 1941, quite delinquent under the lease. This delinquency in payment of minimum rentals exceeded $100,000.00 on March 31, 1942. It was obvious the Bank must cancel the lease for security of the interests of the trust by July 31, 1942. However, despite the default, petitioner had reasonable prospects of avoiding cancellation if increased income could be obtained. It had managed the building efficiently and turned over all the funds which it had been able to obtain from rentals to the lessor, the trustee Bank.

The situation was further complicated by other facts in the background. Before 1933, the Bank had leased the same building to another corporation, Brockman Building Company, which had issued bonds to Pacific Indemnity Company and Pioneer Securities Corporation. In the financial rearrangement of 1933, whereby the original lease to petitioner was executed, it was required to agree to purchase these bonds of face value of about $92,000.00. This was done by written agreement between petitioner and the companies owning the securities. Payment was to be made from its earnings in excess of $3,500.00 per month from its basic lease. But, as has been seen, there was no excess, but a heavy deficit. In order to secure payment for these bonds, Pacific Indemnity and Pioneer Securities were assigned the interest of the lessee, Brockman Building Corporation, in the lease between the Bank and petitioner. The stockholders of petitioner were likewise compelled to assign their respective stock to the selling companies.

During the time the assignment was in effect, the consents of the selling companies were required to any amendment of this lease. But, upon payment therefor, these were to reassign the lease.

The principal subtenant of petitioner under its basic lease was J. J. Haggarty Stores, Inc. This sublease, as well as a lease on an adjoining building which Haggarty used in connection, was about to expire March 14, 1942. This circumstance was apparently very lucky for petitioner because negotiations carried on principally by John Shirley Ward, Chandler P. Ward and David Blankenhorn, who were officers of petitioner and all but the last were stockholders, which had been proceeding for some two years, culminated near the first of 1942, when circumstances might indicate large profits could be anticipated by the sublessee.

About this time a proposed sublease for Haggarty was submitted to the Bank. This instrument provided for an increased fixed rental, and contingent rentals equal to a percentage of Haggarty's gross sales over a certain amount were to be paid to petitioner by Haggarty. The fixed amount was to be paid over to the Bank by petitioner. The contingent rentals were to be retained by petitioner, who was to assign them to John Shirley Ward or to his nominees, who were to be shareholders and bondholder-creditors of petitioner. The Bank refused to consent to this sublease.

Thereupon, a method of accomplishing the same result satisfactory to the Bank was evolved. On March 3, 1942, a sublease was entered between petitioner and Haggarty, which provided for the payment of fixed rental only. The Bank and the bondholders executed consents to the sublease. The Bank relinquished any possible future claims to percentage rentals. On the same date, Haggarty entered into a separate agreement with Title and Trust Company, wherein it agreed to pay to that company the stipulated percentages of gross sales. As trustee, the Title Company obligated itself to pay these percentages, less its compensation and expenses of the trust

to named stockholders of petitioner in proportion to their stock holdings and to the bondholder-creditors.

The forecast as to expected profits was eminently accurate. The payments of percentage rentals by Haggarty were so lush that the bondholders were paid in full by June 1, 1945. (The bonds were cancelled and turned over to petitioner!) From 1942 to 1949, inclusive, the stockholders received $590,000.00 from this source.

The persons who received these percentage payments were two creditors of petitioner and stockholders of petitioner. It was expressly understood and agreed that Pioneer Securities and Pacific Indemnity, when the balance of the principal of bonds held by them respectively was paid, the interest of each of these companies in the "trust and in the lease should terminate" and, significantly, also "any excess [would] then pass to the stockholders in accordance with their stock interests."

The Tax Court held that these amounts were income to petitioner and that tax was due upon them. 21 T.C. 175. The Tax Court found facts which made this conclusion inescapable. These findings were well founded in the evidence and were not clearly erroneous. There was no question of law involved.

 Petitioner was the owner of a leasehold estate in the Brockman Building. The Bank might have cancelled the lease and ended the term, but it chose not to do so. Anything Haggarty paid for the occupancy was paid to or on account of petitioner. If A, the lessor, says to B, the lessee, "You do not need to pay rent to me directly, if you pay C, to whom I owe money," the money so paid is income to A.[1] The lease which the Bank turned down shows the true situation. If any debtor can have his creditor paid by such indirect methods, a new way has been discovered to evade income tax.[2]

There are two arguments with which we should deal. It is contended first that the Bank created a profit *a prendre* in the creditors and stockholders, and second that the payments were not made to creditors and stockholders as such.

As to this first point, the authorities cited from the state courts of California do not intimate even remotely that the interest of the stockholders and debtors in these payments was such common law estate.[3] It would seem a perversion of concepts to attempt to distort such a category in order to include the right to these payments. But one objection to this construction is transcendent. The Bank did not purport to grant such a right and it had no power to make such a grant. The lease between the Bank and petitioner was not cancelled, abrogated or surrendered. That lease was dated July 29, 1933, and the term expired September 30, 1961. This term was not changed by the amendment thereof dated March 3, 1942, and petitioner still owned a leasehold expiring September 30, 1961. There is nothing in the particulars in which the lease was amended which indicates a purpose to convey a vested interest in the lease or the rentals to the stockholders and creditors of pe-

1. Income "is not any the less taxable income of the taxpayer because * * * it is paid directly to another in performance of the taxpayer's obligation to that other." Raybestos-Manhattan, Inc., v. United States, 296 U.S. 60, 64, 56 S.Ct. 63, 65, 80 L.Ed. 44.

2. The courts have used the doctrine of anticipatory assignment to foil "arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731.

The Tax Court relied strongly on United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, a persuasive but not altogether conclusive decision.

3. Civil Code of California (Deering, 1949 Ed.) 802(4), West's Ann.Civ.Code, § 802 (4); Callahan v. Martin, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871; Dabney-Johnson Oil Corporation v. Walden, 4 Cal.2d 637, 52 P.2d 237; Tanner v. Title Insurance & Trust Co., 20 Cal.2d 814, 129 P.2d 383.

titioner. Instead, the Bank and petition-er "reconfirm and ratify" the original lease for the term ending September 30, 1961, to petitioner, saving "only in the particulars" where express changes were made.

The Bank had consistently refused to have a partner in the lease. By this re-fusal, culminating in the amendment which, as noted, reiterated the terms of the original master-lease agreement with-out material change, it simply washed its hands of the creditors and stock-holders of petitioner, as it had said from the beginning of the negotiations for the new Haggarty sublease arrangement. There was never power in the Bank to enforce its own lease for the benefit of the stockholders and creditors of peti-tioner or to convey to these persons any segment of the property interest which it theretofore had entirely conveyed to the Brockman company. Also, the Bank did not approve the original sublease with Haggarty, which gave such parties the right to claim sublease proceeds against the Brockman company by virtue of the contemplated assignment.

Never from the time the Bank leased to Brockman did it have the right or power to create any interest in the nature of profit *a prendre* in the estate thereby vested in petitioner. Therefore, to en-force provisions for their benefit in the sublease to Haggarty, the creditors and stockholders were compelled to have the interest of Haggarty transferred in trust to assure themselves that they would receive the payments contemplated there-by. This was accomplished by striking these provisions for payment from the text of the new Brockman Building Cor-poration-Haggarty sublease, and in lieu thereof Haggarty agreed to transfer these payments of percentages of the profits in trust for their benefit.

Whichever way this transaction had been handled, the fact remains that the income producing res was the leasehold interest vested entirely in Brockman and all the rentals arising therefrom were income to Brockman. It is imma-terial that the arrangements for the payment of this income took another form because of the objections of the Bank. The Tax Court was correct in its conclusion that the plan "whereby the contingent rentals were to be paid into the trust for the benefit of petition-er's stockholders and creditors, was merely a change in form from the plan which was rejected by the Bank."

The stockholders of petitioner received these payments in compensation for the sublease of property of petitioner. The creditors of petitioner received such in-stallments as its creditors and in pay-ment of their debts. Thus the payments were the proceeds of property of the pe-titioner and under the statute were in-come to it.

■■ There was no business purpose to be subserved for the benefit of peti-tioner by the execution of the documents which siphoned off its income for the benefit of its creditors and stockholders. If any stockholder had been left out of the distribution or had not consented thereto, the petitioner could have been required to bring action to set this con-veyance aside. Failing that, the stock-holder excluded could have attacked the conveyance upon his own account. The document purports to state that the con-sideration therefor was the effort of certain stockholders in obtaining the con-sents necessary to have the Haggarty lease put in force. So far as petitioner was concerned this consideration was il-legal, since all of these stockholders, agents and officers were bound as fidu-ciaries to protect its interest and not convert its property for their own bene-fit. It is significant that although only three of the stockholders were active in these negotiations they did not presume to take all the proceeds but included all the stockholders. Of course, from the discussion above, it will be seen that this was an obvious precaution. The stockholders, therefore, were intended to receive these payments as dividends. The fact that the payments were assigned by a stockholder to another who was not a stockholder and that the conveyance has been upheld does not militate against

this conclusion. A stockholder can assign his right to dividends. There was evidence that the parties intended that the payments should "pass to the stockholders in accordance with their stock interests," at least after the payment of the two creditors.

It is of great importance that in the first instance the Haggarty lease was drafted to include payment of these percentages as part of the rent to petitioner. The Bank, however, refused to accede to the assignment of a portion of the rentals to the assignee of petitioner and refused to accept an assignment of petitioner's rights in the sublease to Haggarty, which assignment contained a clause to the effect the petitioner "having heretofore assigned unto .......... all of its right, title and interest as such Lessor in and to the percentage rentals payable and to be paid by the Lessee under said sublease, together with a sufficient interest in said sublease to enforce the same and together with its entire right as Lessor therein to collect and enforce collection of said percentage rentals, does * * * assign" to the Bank "all of its unassigned right, title and interest in and to said sublease, excepting and reserving, however, the percentage rentals payable and to be paid thereunder and excepting and reserving its right to assign unto said .......... to collect and enforce the collection of the same."

It is ironical enough that if the Bank had accepted and consented to this situation some faint color might have been infused into the contentions of petitioner. But the Bank refused. The Bank declined "to have in the lease a partner, whose percentage interest might affect [its] fixed interest." The stockholders and attorneys of petitioner therefore found "it would be necessary to segregate from the lease those provisions relating to percentage rentals." The Bank was well advised.

This genesis of the subsequent transactions and the specific characterization of the proposed payments to the unnamed assignee as *percentage rentals* re-

moves any doubt that they were income to petitioner.

The Bank had a right to refuse Haggarty as a subtenant, but it could not provide that what was paid as rental should pass directly to creditors and stockholders of petitioner without becoming income to the latter.

Affirmed.