## CONLOREZ CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6746–66. Filed December 24, 1968.

*A. Russell Leone*, for the petitioner.
*Stephen M. Miller*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the income tax and additions to the tax of the petitioner as follows:

| Year | Deficiency | Addition to tax | |
|---|---|---|---|
| | | Sec. 6651(a) [1] | Sec. 6653(a) |
| 1961 | $5,329.90 | $1,332.48 | $266.50 |
| 1964 | 22,223.49 | 5,555.87 | 1,111.17 |
| | 27,553.39 | 6,888.35 | 1,377.67 |

The issues for decision are: (1) Whether the petitioner realized any gain in 1961 as a result of a partial payment received by it in that year for its property that was involuntarily converted; (2) whether the petitioner filed timely income tax returns for the years 1961 and 1964,

---

[1] All statutory references are to the Internal Revenue Code of 1954.

and if not, whether such failure was due to reasonable cause or willful neglect; and (3) whether any part of any underpayments of tax due for the taxable years 1961 and 1964 were due to negligence or intentional disregard of rules and regulations.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Conlorez Corp., is a New York corporation, which had its principal place of business in Lewiston, N.Y., at the time the petition was filed in this case. For the taxable years 1961 and 1964, the petitioner filed its Federal income tax returns with the district director of internal revenue at Buffalo, N.Y.

In 1952, the petitioner purchased certain real property consisting of land and a building thereon located in Niagara Falls, N.Y. Such land and building are hereinafter referred to as the realty. On September 24, 1959, the adjusted basis of the realty was $55,580.39. The realty was leased by the petitioner, and on September 24, 1959, it was under lease to a tenant which had made various improvements thereon. Under the terms of the lease, such improvements were to become the property of the petitioner upon expiration of the lease.

On September 24, 1959, the realty was appropriated by the State of New York for highway purposes. Title to the realty passed to the State on that date pursuant to New York law.[2] No payment was then made to the petitioner on account of such appropriation.

Sometime prior to December 8, 1960, the State of New York appraised the value of the realty at $136,500 and offered such sum in full payment for all claims thereto. The petitioner rejected this offer, and instead, on December 8, 1960, it executed an agreement for partial payment with the State. The agreement, which was offered to the petitioner by virtue of New York law,[3] provided for payment to the petitioner of $81,900, 60 percent of the appraised value of the realty. It also included an offer to pay the petitioner the remaining 40 percent of the appraised value in exchange for a full release and such other documents as the attorney general might require. The agreement reserved to the petitioner its right to file a claim with the New York Court of Claims for a greater award, but provided that if such court found the realty to be worth less than $81,900, the State could file a counterclaim to recover the excess of $81,900 over the award.

---

[2] N.Y. H'way Law sec. 30(6) (McKinney 1962).
[3] N.Y. H'way Law sec. 30(13) (McKinney Supp. 1961), as amended, N.Y. H'way Law sec. 30(13) (McKinney Supp. 1967).

On July 10, 1961, the State paid the petitioner $81,900 pursuant to the agreement. The $81,900 was disbursed by the petitioner as follows:

| | |
|---|---:|
| Mortgage interest | $680.02 |
| Real estate tax | 2,225.94 |
| Mortgage | 23,651.65 |
| Legal fees | 5,000.00 |
| Loaned to stockholders in 1961 | 20,000.00 |
| Loaned to stockholders in 1962 | 26,000.00 |
| Retained in corporate account | 4,342.39 |
| | 81,900.00 |

On July 27, 1961, the petitioner and its tenant filed a claim for $400,000 in the Court of Claims of New York. On March 31, 1964, the Court of Claims awarded the claimants $168,150 plus interest of $10,882.32. Of these amounts, $1,575 and $302.32, respectively, were allocated to the petitioner's tenant, leaving a net award to the petitioner of $166,575 in principal and $10,580 in interest. In 1964, the State paid the petitioner $84,675 ($166,575 less $81,900 paid in 1961) plus $10,580 in interest.

In 1965, the petitioner purchased real property to be used for rental purposes for a sum exceeding the total award of $166,575.

The petitioner filed its 1961 return on November 1, 1963, and filed its 1964 return on June 14, 1966. Searches of the records of both the Buffalo district director's office and the Federal Records Center in New York City did not disclose receipt by the district director of any previous return for the year 1961.

The petitioner's 1961 and 1964 returns were prepared by its accountant, who was experienced in tax matters. Each of the returns disclosed receipt of the partial payment and outlined the circumstances of such receipt.

### OPINION

### Issue 1. Recognition of Gain on Involuntary Conversion of the Realty

The initial issue for decision is whether the petitioner should have recognized gain in 1961 and 1964 on account of payments made to it by the State of New York for appropriation of the realty, or whether under section 1033 it is entitled to not recognize such gain.

Section 1033 provides generally for recognition of gain on property involuntarily converted into money, but a taxpayer may elect nonrecognition when the amount realized on the conversion is invested in other similar property. In order to qualify for nonrecognition, the

reinvestment must occur within the period prescribed by section 1033 (a) (3) (B), which provides as follows:

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

The respondent contends that when the petitioner received $81,900 in 1961, it realized gain; that the realization of such gain started the running of the period within which the realty had to be replaced in order for the petitioner to qualify for nonrecognition under section 1033; that the realty was not replaced within the period described in section 1033 (a) (3) (B) (i) ; and that the petitioner failed to obtain permission to replace the realty within a longer period. For these reasons, the respondent argues that the petitioner's gain on the involuntary conversion of the realty must be recognized. See *Adolph K. Feinberg*, 45 T.C. 635, 640 (1966), affd. 377 F. 2d 21 (C.A. 8, 1967) ; *Estate of Jacob Resler*, 17 T.C. 1085 (1952). The petitioner does not contend that the realty was replaced before 1965, nor that there was an extension of the time for replacement. Rather, the petitioner asserts that no gain was realized until 1964, and therefore, its replacement of the realty in 1965 was timely for purposes of its section 1033 nonrecognition election.

The petitioner argues that the 1961 partial payment did not result in a realization of gain in that year since its right to the amount of such payment was not finally established until the decision of the New York Court of Claims in 1964. The partial-payment agreement provided that, in the event the Court of Claims rendered an award less than the partial payment, the State could file a counterclaim with the court to recover the excess of the partial payment over the final award. Further, the petitioner points out that it was not the only party having an interest in the realty. Its tenant, which had made improvements to the realty, had a leasehold interest which was compensable under New York law—the petitioner's president testified that the tenant claimed its interest had a value of $80,000. For these reasons, the petitioner argues that its legal claim to the partial payment was so indefinite that its receipt thereof cannot be characterized as a realization of gain.

We are not convinced by the petitioner's arguments. It is well established that earnings received under a claim of right, not subject to any limitation on use, are taxable in the year received, even though at the time of receipt conditions exist which might require the taxpayer to return part or all of such earnings. E.g., *North American Oil* v. *Burnet*, 286 U.S. 417 (1932) ; *Monroe Abstract Corporation*, 41 B.T.A. 5 (1940). This doctrine has been applied to the receipt of gain from the sale of property. *Fawsett* v. *Commissioner*, 63 F. 2d 445 (C.A. 7, 1933), affirming 23 B.T.A. 1148 (1931), certiorari denied 290 U.S. 641 (1933) ; *D. H. Byrd*, 32 B.T.A. 568 (1935) ; *William M. Davey*, 30 B.T.A. 837 (1934), appeal dismissed 88 F. 2d 1008 (C.A. 9, 1937).

The petitioner received the partial payment under a claim of right. According to the State of New York, the partial payment represented only 60 percent of the compensable value of the realty. Although it appears that the petitioner's tenant also had a compensable interest in the total value of the realty, and was claiming $80,000 as its interest, the value of such interest was speculative and the record does not disclose that any part of the partial payment was remitted to or set aside for the benefit of the tenant. The record does disclose that the tenant's claim of $80,000 was optimistic in the extreme, since the Court of Claims awarded it only $1,575 for its interest in the realty. The petitioner obviously felt that the amount of the partial payment, and substantially more, was due it for its interest in the realty, and this belief was ultimately vindicated by the Court of Claims.

In addition to receiving the partial payment under a claim of right, the petitioner was not subject to any limitation on its use of such payment. To be sure, it may have incurred a contingent liability to both its tenant and the State, but such liability was inchoate, and did not prevent the petitioner from disposing of the partial payment for its own purposes.

The petitioner offers various other arguments in support of its position that it did not realize part of the gain in 1961. It contends that because it had a contingent liability to repay part or all of the partial payment, such payment was in the nature of a loan and therefore not taxable. See *E. C. Gatlin*, 34 B.T.A. 50 (1936). There is no evidence indicating that the petitioner intended or expected to repay the partial payment either to the State or to its tenant. On the contrary, the evidence indicates that the petitioner believed is compensable interest in the realty was worth more than the partial payment. Similarly, it has not been shown that the State, although protecting itself by the inclusion of a clause in the partial-payment agreement allowing it to recover any excess of the partial payment over the award, intended a loan or expected recovery of the partial payment. In these

circumstances, we cannot see how the partial payment could constitute a loan for tax purposes. See *Stein* v. *Director of Internal Revenue*, 135 F. Supp. 356 (E.D. N.Y. 1955); *Resthaven Memorial Cemetery, Inc.*, 43 B.T.A. 683 (1941); *William M. Davey, supra.*

The petitioner points out that in 1961 and in 1962 it had no idea what the final award in respect of the realty would be and could not then make an intelligent judgment as to the amount it should reinvest. It argues that it postponed replacing the realty in good faith until it had determined the full extent of its award. However, section 1033(a)(3)(B) specifically sets forth the time within which property must be replaced in order to qualify for nonrecognition. For those taxpayers who cannot replace converted property within the 1-year period described in section 1033(a)(3)(B)(i), the statute provides an alternative by allowing them to obtain an extension of time within which to replace such property. The petitioner failed to qualify under either provision and therefore cannot elect nonrecognition. See *Adolph K. Feinberg, supra.*

The petitioner argues in its brief that it relied on its accountant to file an application for an extension of time in which to reinvest the proceeds of the involuntary conversion. However, no evidence was presented that the petitioner had ever directed the accountant to make such an application. Therefore, we need not decide whether the existence of such a direction would satisfy the statute in the absence of an actual designation of a replacement date by the respondent. See *Winter Realty & Const. Co.* v. *Commissioner*, 149 F. 2d 567, 570 (C.A. 2, 1945), certiorari denied 326 U.S. 754 (1945); *Rosenfield* v. *United States*, 156 F. Supp. 780 (E.D. Pa. 1957), affirmed per curiam 254 F. 2d 940 (C.A. 3, 1958).

Finally, the petitioner argues that even if it is required to recognize the gain realized in 1961, at least part of the gain represented by the 1964 payment should not be recognized. In support of this argument the petitioner relies on *Winter Realty & Const. Co.* v. *Commissioner*, supra. However, that case involved different provisions of law. Under section 1033, if property involuntarily converted is not replaced within the period described in section 1033(a)(3)(B), a taxpayer cannot elect nonrecognition for any part of the gain on the conversion of such property.

We conclude that the petitioner realized gain in 1961 when it received a partial payment from the State of New York which exceeded its basis in the realty. Since the realty was not replaced before 1963, and since there was no extension of the time for replacing it, the petitioner does not qualify for nonrecognition of gain under section 1033.

*Issue 2.  Failure to File Timely Tax Returns for 1961 and 1964*

The respondent determined additions to tax pursuant to section 6651(a) for the petitioner's failure to file timely income tax returns for 1961 and 1964. Such returns were due March 15, 1962, and March 15, 1965, respectively. Sec. 6072(b).

Section 6651(a) provides an addition to tax for the failure to file a return on or before the date it is due unless the taxpayer can show that such failure is due to reasonable cause and not willful neglect. The only 1961 return which the respondent has any record of receiving from the petitioner is one dated October 11, 1963, and bearing a file stamp indicating receipt by the respondent on November 1, 1963. Such return shows no tax due. The petitioners makes no contention that the return delivered on November 1, 1963, was timely filed. Rather, the evidence indicates that this return was filed after the petitioner had been informed in 1963 that the respondent had no record of receiving its 1961 return.

The petitioner does, however, contend that it prepared and mailed another 1961 return in ample time to reach the respondent on or before March 15, 1962. If such assertion is supported by the evidence, it would establish a rebuttable presumption that the return was timely filed (*Crude Oil Corp.* v. *Commissioner*, 161 F. 2d 809, 810 (C.A. 10, 1947), reversing 6 T.C. 648 (1946); *Max Kralstein*, 38 T.C. 810, 820 (1962)) and additionally would establish reasonable cause and absence of willful neglect for untimely filing. *Walter M. Ferguson, Jr.*, 14 T.C. 846, 850 (1950).

The petitioner bears the burden of proof with respect to the time and manner of mailing (*Irvine F. Belser*, 10 T.C. 1031, 1044 (1948), affd. 174 F. 2d 386 (C.A. 4, 1949), certiorari denied 338 U.S. 893 (1949)), and we find that it has not satisfied such burden. At the trial, there was testimony by the petitioner's accountant, its president, and its president's wife as to the conclusion that the return was timely prepared and mailed. Yet, none of the witnesses could testify as to the specific time when such return was mailed or the specific person who deposited the return in the mail. Furthermore, there was considerable confusion as to who was charged with the responsibility of mailing the return as between the petitioner's employees and the accountant and his employees. The petitioner's president testified that it was the practice for either the accountant or the petitioner to mail the returns. At another point in his testimony, he stated that it was the custom that the accountant mail the returns. The president's wife testified that the accountant filed the petitioner's returns. The accountant testified that usually he did not mail clients' tax returns, but also testified that the

petitioner's 1961 return was mailed from his office, although he could not state when and by whom it was mailed. Evidence was introduced by the petitioner indicating that its 1961 return was prepared in adequate time for timely filing. However, the fact that such return was prepared prior to its due date does not establish that it was mailed in time for timely filing. The petitioner's evidence as to the mailing of the return is both confused and equivocal, and therefore we find it has not satisfied its burden of proving that its 1961 return was mailed or filed prior to November 1, 1963. See *Irvine S. Belser, supra.*

The petitioner relies on *Bouvelt Realty, Inc.,* 46 B.T.A. 45 (1942), where we found that the failure to file a return timely was due to reasonable cause and not willful neglect. However, in that case, it was established that a specific person, one Grace Gaghan, an employee of the petitioner's attorney, had the responsibility of mailing the tax return, that the return was delivered to her for mailing, and that it was misplaced during an established mailing procedure. On the other hand, in the present case, the responsibility for mailing the return was not fixed, and no procedure was established for its mailing. In these circumstances, we do not believe that the petitioner could reasonably rely on its accountant to file the return and has therefore not established either the presence of reasonable cause or the absence of willful neglect for the untimely filing of its 1961 return.

The petitioner makes no contention that its 1964 income tax return was timely filed. It does contend that the failure to file its 1964 return timely was due to reasonable cause and not willful neglect. Its only support for this contention is that at the time the 1964 return should have been filed, its books were being audited in connection with an earlier return. However, such fact does not constitute reasonable cause for failing to file its 1964 return timely. See *Calvert Iron Works, Inc.,* 26 T.C. 770, 782 (1956). Moreover, the respondent's agent who was carrying on the audit of the petitioner at the time in question testified that, when it came to her attention in 1965 that the petitioner had not filed its 1964 return, she repeatedly urged that it do so at the earliest possible date and had conversations with both the petitioner's accountant and its president in connection with this matter. Despite such urging, it was not until the middle of 1966 that the petitioner filed its 1964 return. Since the petitioner has produced no other evidence as to its reason for failing to file a timely 1964 return, the determination of the respondent must be sustained. *William M. Bebb,* 36 T.C. 170, 173 (1961).

### Issue 3.   Negligent Failure to Pay Tax

The respondent has determined an addition to tax pursuant to section 6653(a) providing a 5-percent addition to tax when an under-

payment is due to negligence or intentional disregard of rules and regulations.

The petitioner's 1961 and 1964 income tax returns were prepared by its accountant and fully disclosed receipt of sums in respect of the involuntary conversion of the realty. The accountant was experienced in tax matters, and the evidence indicates that the petitioner relied in good faith on his advice. In these circumstances, we find that the underpayment of income tax was not due to the petitioner's negligence or intentional disregard of rules and regulations. *Brockman Building Corporation*, 21 T.C. 175, 191 (1953), affd. 231 F. 2d 145 (C.A. 9, 1955), certiorari denied 350 U.S. 936 (1956); *R. E. Nelson*, 19 T.C. 575, 581 (1952); *Davis Regulator Co.*, 36 B.T.A. 437, 444 (1937).

The petitioner in its brief contends that if the respondent's deficiency for the year 1961 is sustained, it should be allowed to deduct $2,225.94 for real property taxes and $680.02 for interest in computing its 1961 taxable income. We have found that these sums were paid out of the $81,900 partial payment received in July 1961. However, no evidence was introduced at the trial to indicate that these expenses were properly deductible by the petitioner; and if they were deductible, it has not been established that 1961 is the proper year for deduction. To establish when such items were deductible, the petitioner must show the method of accounting employed for tax purposes and also the year in which the expense items were either accrued or paid. Although some evidence indicates that these expenses were paid in 1961, it is not clear whether the petitioner is a cash or accrual method taxpayer. No evidence has been presented on the question of when the expense items were accruable. Accordingly, there is no basis to grant the requested adjustments.

*Decision will be entered under Rule 50.*